NUMBER 13-00-431-CR

COURT OF APPEALS
 
THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG




BOBBY LEE HRANICKY,                                                             Appellant,

v.

THE STATE OF TEXAS,                                                                Appellee.




On appeal from the 24th District Court
of DeWitt County, Texas.




MEMORANDUM OPINION
Before Justices Rodriguez, Castillo, and Wittig




Memorandum Opinion by Justice Castillo

         Bobby Lee Hranicky appeals his conviction for the second-degree felony offense
of recklessly causing serious bodily injury to a child.


 A jury found him guilty,
sentenced him to eight years confinement in the Institutional Division of the Texas
Department of Criminal Justice, and assessed a $5,000 fine. On the jury's
recommendation, the trial court suspended the sentence and placed Hranicky on
community supervision for ten years. 
         In seven issues, Hranicky asserts: (1) the trial court should have quashed the
indictment; (2) the evidence is legally insufficient; (3) the evidence is factually
insufficient; (4) the trial court improperly interlineated amending language on the face
of the indictment; (5) the amended indictment did not give him the statutory ten days'
notice before trial and charged a different offense than the original; (6) the trial court
submitted an erroneous jury charge; and (7) the trial court abused its discretion by
allowing autopsy photographs into evidence. The trial court has certified that Hranicky
has the right of appeal.


 See Tex. R. App. P. 25.2(a)(2). We affirm. 
I. RELEVANT FACTS
         This is a memorandum opinion not designated for publication. The parties are
familiar with the facts. We will not recite them here except as necessary to advise the
parties of our decision and the basic reasons for it. See Tex. R. App. P. 47.4.
         A newspaper advertisement offering tiger cubs for sale caught the eye of eight-year-old Lauren Villafana. She decided she wanted one. She expressed her wish to
her mother, Kelly Dean Hranicky, and to Hranicky, her stepfather. Over the next year,
the Hranickys investigated the idea by researching written materials on the subject and 
consulting with owners of exotic animals. They visited tiger owner and handler
Mickey Sapp several times. They decided to buy two rare tiger cubs from him, a male
and a female whose breed is endangered in the wild. They brought the female cub
home first, then the male about a month later. 
         Sapp trained Hranicky in how to care for and handle the animals. In particular,
he demonstrated the risk adult tigers pose for children. Sapp escorted Hranicky, Kelly
Hranicky, and Lauren past Sapp's tiger cages. He told the family to watch the tigers'
focus of attention. The tigers' eyes followed Lauren as she walked up and down
beside the cages. 
         The Hranickys raised the cubs inside their home until they were six or eight
months old. Then they moved the cubs out of the house, at first to an enclosed porch
in the back and ultimately to a cage Hranicky built in the yard. The tigers matured into
adolescence. The male reached 250 pounds, the female slightly less. Lauren actively
helped Hranicky care for the animals. 
         By June 6, 1999, the tigers were two years old. Lauren was ten. She stood
57 inches tall and weighed 80 pounds. At dusk that evening, Lauren joined Hranicky
in the tiger cage. Suddenly, the male tiger attacked her. It mauled the child's throat,
breaking her neck and severing her spinal cord. She died instantly. 
         The record reflects four different versions of the events that led to Lauren's
death. Hranicky told the grand jury


 Lauren and he were sitting side-by-side in the
cage about 8:00 p.m., petting the female tiger. A neighbor's billy goat cried out. The
noise attracted the male tiger's attention. He turned toward the sound. The cry also
caught Lauren's attention. She stood and looked at the male tiger. When Lauren
turned her head toward the male tiger, "that was too much," Hranicky told the grand
jury. The tiger attacked. Hranicky yelled. The tiger grabbed Lauren by the throat and
dragged her across the cage into a water trough. Hranicky ran after them. He struck
the tiger on the head and held him under the water. The tiger released the child. 
         Kelly Dean Hranicky testified she was asleep when the incident occurred. She
called for emergency assistance. Through testimony developed at trial, she told the
dispatcher her daughter had fallen from a fence. She testified she did not remember
giving that information to the dispatcher. However, police officer Daniel Torres, who
responded to the call, testified he was told that a little girl had cut her neck on a fence. 
          Hranicky gave Torres a verbal statement that evening. Torres testified Hranicky
told him that he had been grooming the female tiger. He asked Lauren to come and
get the brush from him. Lauren came into the cage and grabbed the brush. Hranicky
thought she had left the cage because he heard the cage door close. Then, however,
Hranicky saw Lauren's hand "come over and start grooming the female, start petting
the female cat, and that's when the male cat jumped over." The tiger grabbed the
child by the neck and started running through the cage. It dragged her into the water
trough. Hranicky began punching the tiger in the head, trying to get the tiger to
release Lauren. 
         Justice of the Peace James Dawson performed an inquest at the scene of the
incident. Judge Dawson testified Hranicky gave him an oral statement also. Hranicky
told him Lauren went to the cage on a regular basis and groomed only the female tiger. 
He then corrected himself to say she actually petted the animal. Hranicky was "very
clear about the difference between grooming and petting." Hranicky maintained that
Lauren never petted or groomed the male tiger. Hranicky told Dawson that Lauren
asked permission to enter the cage that evening, saying "Daddy, can I come in?" 
         Sapp, the exotic animal owner who sold the Hranickys the tigers, testified
Hranicky told him yet another version of the events that night. When Sapp asked
Hranicky how it happened, Hranicky replied, "Well, Mickey, she just snuck in behind
me." On the day of Hranicky's grand jury testimony, Hranicky admitted to Sapp he
had allowed Lauren to enter the cage. Hranicky told Sapp he had lied because he did
not want Sapp to be angry with him. 
         Hranicky told the grand jury that Sapp and other knowledgeable sources had
said "there was no problem in taking a child in the cage." He did learn children were
especially vulnerable because the tigers would view them as prey. However, Hranicky
told the grand jury, he thought the tigers would view Lauren differently than they
would an unfamiliar child. He believed the tigers would not attack her, he testified. 
They would see her as "one of the family." Hranicky also told the grand jury the
tigers' veterinarian allowed his young son into the Hranickys' tiger cage. 
         Several witnesses at trial contradicted Hranicky's assessment of the level of risk
the tigers presented, particularly to children. Sapp said he told the Hranickys it was
safe for children to play with tiger cubs. However, once the animals reached forty to
fifty pounds, they should be confined in a cage and segregated from any children. 
"[T]hat's enough with Lauren, any child, because they play rough, they just play
rough." Sapp further testified he told the Hranickys to keep Lauren away from the
tigers at that point because the animals would view the child as prey. He also said he
told Lauren directly not to get in the cage with the tigers. Sapp did not distinguish
between children who were strangers to the tigers and those who had helped raise the
animals. He described any such distinction as "ludicrous." In fact, Sapp testified, his
own two children had been around large cats all of their lives. Nonetheless, he did not
allow them within six feet of the cages. The risk is too great, he told the jury. The
Hranickys did not tell him that purchasing the tigers was Lauren's idea. Had he
known, he testified, "that would have been the end of the conversation. This was not
for children." He denied telling Hranicky that it was safe for Lauren to be in the cage
with the tigers. 
         Charles Currer, an animal care inspector for the United States Department of
Agriculture, met Hranicky when Hranicky applied for a USDA license to exhibit the
tigers. Currer also denied telling Hranicky it was permissible to let a child enter a
tiger's cage. He recalled giving his standard speech about the danger big cats pose
to children, telling him that they "see children as prey, as things to play with." 
         On his USDA application form, Hranicky listed several books he had read on
animal handling. One book warned that working with exotic cats is very dangerous. 
It emphasized that adolescent males are particularly volatile as they mature and begin
asserting their dominance. Big cat handlers should expect to get jumped, bit, and
challenged at every juncture. Another of the listed books pointed out that tigers give
little or no warning when they attack. The book cautioned against keeping large cats
such as tigers as pets.  
         Veterinarian Dr. Hampton McAda testified he worked with the Hranickys' tigers
from the time they were six weeks old until about a month before the incident. 
McAda denied ever allowing his son into the tigers' cage. All large animals present
some risk, he testified. He recalled telling Hranicky that "wild animals and female
menstrual periods . . . could cause a problem down the road" once both the animals
and Lauren matured. Hranicky seemed more aware of the male tiger, the veterinarian
observed, and was more careful with him than with the female. 
         Robert Evans, the Curator of Mammals at the San Antonio Zoo, testified that
it is zoo policy to enter a tiger's cage only after anesthetizing the animal. Otherwise,
entering the cage is too dangerous. However, Evans conceded on cross-examination,
these zoo policies are not known to the general public. 
         James Boller, the Chief Cruelty Investigator for the Houston SPCA, testified that
tigers, even those raised in captivity, are wild animals that act from instinct. Anyone
who enters a cage with a conscious adult tiger should bring a prop to use as a
deterrent. Never take one's eyes off the tiger, Evans told the jury. Never make
oneself appear weak and vulnerable by diminishing one's size by crouching or sitting. 
Never bring a child into a tiger cage. The danger increases when the tigers are in
adolescence, which begins as early as two years of age for captive tigers. Entering
a cage with more than one tiger increases the risk. Entering with more than one
person increases the risk further. Entering with a child increases the risk even more. 
Tigers' activity level depends on the time of day, Boller told the jury. They tend to be
more active during the early morning, twilight, and late evening. Thus, the time of day
one enters a cage also can increase the risk factor. Boller identified eight o'clock on
a summer evening as a high activity time. A child should never enter a tiger cage in
the first place, Boller testified. Taking a child into a tiger cage "during a high activity
time for the animal is going to increase your risk dramatically." 
         Dr. Richard Villafana, Lauren's biological father, told the jury he first learned of
the tigers when his daughter told him over the phone she had a surprise to show him
at their next visit. When he came to pick her up the following weekend, he testified,
she took him into the house and showed him the female cub. Villafana described his
reaction as "horror and generalized upset and dismay, any negative term you care to
choose." He immediately decided to speak to Kelly Hranicky about the situation. He
did not do so in front of Lauren, however, in an effort to avoid a "big argument." 
Villafana testified he later discussed the tigers with Kelly Hranicky, who assured him 
Lauren was safe. Villafana "always had lingering doubts," however. He did not learn
of the second tiger until a month or two after he saw the first one. The jury heard that
Villafana was not comfortable around either animal, but that he had a "little bit more
fear" of the male than the female, as "the male tiger seemed much more aggressive
or excitable." 
         As the tigers matured, no one told Villafana the Hranickys allowed Lauren in the
cage with them. Had he known, he "would have talked to Kelly again" and "would
have told her that [he] was greatly opposed to it and would have begged and pleaded
with her not to allow her in there." He spoke to his daughter about his concerns about
the tigers "almost every time" he saw her. 
         Kelly Hranicky told the jury Lauren was a very obedient child. Villafana agreed. 
Lauren would not have gone into the tiger cage that evening without Hranicky's
permission. 
II. THE INDICTMENT AND JURY CHARGE CHALLENGES
         Hranicky groups his fourth and fifth issues together. He complains that the trial
court, not the prosecutor, physically interlineated amending language on the face of
the indictment. He asserts that the amended indictment did not provide him ten days'
notice before trial and charged a different offense than the original. He also argues he
was entitled to ten days' notice between the State's second and third amendments. 
In his first issue, Hranicky contends the trial court abused its discretion in denying his
motion to quash the indictment. In his sixth issue, he urges that the trial court
erroneously charged the jury in the disjunctive when the State alleged in the
conjunctive in the indictment. 

A. Procedural Background
         The original indictment alleged:
BOBBY LEE HRANICKY on or about the 6th day of June, A.D.
1999, and anterior to the presentment of this Indictment, in DeWitt
County, Texas, did then and there recklessly and with criminal negligence
by an act, cause serious bodily injury to LAUREN CASEY VILLAFANA, a
child, by allowing the said LAUREN CASEY VILLAFANA to enter a cage
occupied by two (2) Siberian Tigers, wherein one of the said tigers did
attack LAUREN CASEY VILLAFANA by biting her and by grabbing her
about the neck with his mouth and did thereby cause serious bodily injury
to the said LAUREN CASEY VILLAFANA. 

         On September 8, 1999, Hranicky filed a motion to quash the indictment,
claiming: 
the indictment fails to allege an offense with the degree of certainty that
would give the defendant notice of the particular offense with which he
is charged, fails to inform the defendant of the nature and cause of the
accusation against him, and fails to state facts sufficient to ensure a bar
to a subsequent prosecution for the same offense. Specifically, the
indictment does not give notice of the reckless or negligent acts which
allegedly caused the injury to a child. The allegation that "allowing" a
child to enter a cage is criminal conduct does not give fair notice of the
act defendant committed. 

         On March 2, 2000, the State filed a motion for leave to amend the indictment. 
The trial court granted the motion on March 16, 2000. The order read: 
The indictment is amended by omitting the word "Siberian," by changing
the word "Tigers" to "tigers," and by changing "his" to "its" and the
indictment will read in part ". . . cage occupied by two (2) tigers wherein
one of the said tigers did attack LAUREN CASEY VILLAFANA by biting
her and by grabbing her about the neck with its mouth. . ." in the
charging paragraph.

         In open court, the trial court directed the prosecutor in interlineating the
amended language. This first amendment to the indictment was not responsive to
Hranicky's motion to quash. 
         On April 6, 2000, Hranicky filed a brief in support of his motion to quash. The
State responded on April 17, 2000. On April 19, 2000, the State filed a second
motion for leave to amend the indictment: 
by inserting into the indictment after the words "two (2) tigers" the
following: ", by allowing the said LAUREN CASEY VILLAFANA to enter
a cage occupied by two (2) tigers, by asking and directing her to assist
the defendant in the cage, and by nodding his head in the affirmative
when LAUREN CASEY VILLAFANA requested to enter the cage, and by
verbally giving LAUREN CASEY VILLAFANA permission to enter the cage,
and by walking towards LAUREN CASEY VILLAFANA to make sure a
tiger did not go into the containment area and closed the door after
LAUREN CASEY VILLAFANA entered the cage. . . ." 

         On May 8, 2000, before the trial court held a hearing on the State's second
motion to amend, the State filed a third motion, this time seeking to amend the
indictment:
by inserting into the indictment after the words "two (2) tigers" the
following: ", by asking and directing her to assist the said BOBBY LEE
HRANICKY in the cage, and by nodding his head in the affirmative when
LAUREN CASEY VILLAFANA requested to enter the cage, and by verbally
giving LAUREN CASEY VILLAFANA permission to enter the cage, and by
walking towards LAUREN CASEY VILLAFANA to make sure a tiger did
not go into the containment area and closed the door after LAUREN
CASEY VILLAFANA entered the cage. . . ." 

         On May 11, 2000, after a hearing, the trial court ordered the indictment to be
amended again, so that as amended it read in its entirety:
BOBBY LEE HRANICKY on or about the 6th day of June, A.D. 1999, and
anterior to the presentment of this Indictment, in DeWitt County, Texas,
did then and there recklessly and with criminal negligence by an act,
cause serious bodily injury to LAUREN CASEY VILLAFANA, a child, by
allowing the said LAUREN CASEY VILLAFANA to enter a cage occupied
by two (2) tigers, by asking and directing her to assist the said BOBBY
LEE HRANICKY in the cage, and by nodding his head in the affirmative
when LAUREN CASEY VILLAFANA requested to enter the cage, and by
verbally giving LAUREN CASEY VILLAFANA permission to enter the cage,
and by walking towards LAUREN CASEY VILLAFANA to make sure a
tiger did not go into the containment area and closed the door after
LAUREN CASEY VILLAFANA entered the cage wherein one of the said
tigers did attack LAUREN CASEY VILLAFANA by biting her and by
grabbing her about the neck with his mouth and did thereby cause
serious bodily injury to the said LAUREN CASEY VILLAFANA. 

         In open court on May 11, 2000, in the presence of all parties after the trial court
granted the State's motion to amend, the trial judge physically interlineated the
amendments on the face of the indictment. Hranicky did not object to the procedure
at the time. 
         Also at the May 11th hearing on the State's motion to amend, defense counsel
referenced Hranicky's motion to quash, stating:
Judge Kilgore ruled or considered – had under advisement the motion to
quash. As a result of a – basically, a conditional ruling on our motion to
quash, that is, he basically said, I think the indictment as written fails to
give adequate notice under due process of what's charged. The State
amended the indictment a second time. 

As a result, the trial court did not hear the motion to quash on May 11. Hranicky re-asserted the motion as a pretrial matter on May 22, 2000. At that time, he also
objected to the procedure by which the trial judge had interlineated the State's
amendments on the face of the indictment. Finally, he objected that the May 11
amendment did not give him the requisite ten days' notice. The trial court denied the
motion to quash and overruled Hranicky's procedural objections. The jury panel was
seated and sworn that day. 
B. The Indictment Issues
1. Interlineation
         "All amendments of an indictment or information shall be made with
the leave of the court and under its direction." Tex. Code Crim. Proc. Ann.
art. 28.11 (Vernon 1989). Physical interlineation of the original indictment is
an acceptable means of effecting an amendment to an indictment. Riney v. State,
28 S.W.3d 561, 565 (Tex. Crim. App. 2000). Article 28.11 does not specify who
physically must make the interlineation. However, the court of criminal appeals
expressed no concern when analyzing an interlineation to an amendment that "was
apparently done by the trial court, although the initials [were] not entirely clear." 
Wright v. State, 28 S.W.3d 526, 531 n.4 (Tex. Crim. App. 2000). 
         We are not troubled by the procedure, either. Hranicky "need go no further than
the 'face of the charging instrument' itself to be informed" of the charges against him,
regardless of who wrote the amendments. See Knapp v. State, 942 S.W.2d 176, 184
(Tex. App.–Beaumont 1997, pet. ref'd.) (quoting Ward v. State, 829 S.W.2d 787,
793 n.14 (Tex. Crim. App. 1992)). Moreover, we do not see how the involvement of
the trial judge in making the interlineation personally instead of directing the prosecutor
to do it affected Hranicky's substantial rights. See Tex. R. App. P. 44.2(b). We hold
harmless any error in the trial judge's personal interlineation of the amendment on the
face of the indictment. See id. 
2. Notice
         "On the request of the defendant, the court shall allow the defendant
not less than 10 days, or a shorter period if requested by the defendant, to
respond to the amended indictment or information." Tex. Code Crim. Proc. Ann.
art. 28.10(a) (Vernon 1989). The computation of deadlines provided in the code of
criminal procedure is controlled by the code construction act. Scott v. State,
634 S.W.2d 853, 854-55 (Tex. Crim. App. [Panel Op.] 1982). In computing a period
of days, we exclude the first day. Tex. Gov't Code Ann. § 311.014(a) (Vernon 1988). 
We include the last day. Id. If the last day of any period is a Saturday, Sunday, or
legal holiday, we extend the period to include the next day that is not a Saturday,
Sunday, or legal holiday. Tex. Gov't Code Ann. § 311.014(b) (Vernon 1988). 
         A trial on the merits commences when jeopardy attaches. Carpenter v. State,
952 S.W.2d 1, 6 (Tex. App.–San Antonio 1997), aff'd, 979 S.W.2d 633 (Tex. Crim.
App. 1998). Jeopardy attaches when a jury is impaneled and sworn. Hinojosa v.
State, 875 S.W.2d 339, 342 (Tex. App.–Corpus Christi 1994, no pet.). The trial
court interlineated the amendment on the face of the indictment on May 11, 2000. 
Excluding the first day and including the last, the tenth day fell on Sunday, May 21,
2000. Hranicky argues that section 311.014(b) extends the tenth day to Monday,
May 22, 2000, the day the trial started with the impanelment and swearing of the
jury. Thus, he concludes, the amendment gave him only nine days' notice before trial,
not ten. Finally, he argues that violation of article 28.10(a) is reversible error not
subject to a harm analysis, citing Sodipo v. State, 815 S.W.2d 551, 555 (Tex. Crim.
App. 1990). 
         However, Sodipo held that amendments on the date of trial violated
subsection (b) of article 28.10, not subsection (a). See State v. Toney,
979 S.W.2d 642, 646 (Tex. Crim. App. 1998) (citing Sodipo, 815 S.W.2d at 554). 
The Sodipo court held that the error was not subject to a harm analysis. Sodipo,
815 S.W.2d at 554. Conducting a harm analysis, the court of criminal appeals
reasoned, prevents giving effect to the full meaning and intent of an unambiguous
statute. Toney, 979 S.W.2d at 646 (citing Sodipo, 815 S.W.2d at 554.). 
         However, subsection (a) of article 28.10, unlike subsection (b), is subject to a
harm analysis:
The thrust of appellant's argument is that because he was not properly
notified of the amendment to the indictment, he was entitled to no less
than a ten-day period to address the change and prepare for trial. We
need not determine whether the amendment to the indictment
was indeed effective or whether the trial court erred in denying
appellant ten days to prepare for trial. Rather, we hold that appellant
was not harmed by these events. See Tex. R. App. P. 44.2; Cain v.
State, 947 S.W.2d 262 (Tex. Crim. App. 1997).

Wright, 28 S.W.3d at 531-32. Likewise, we are unpersuaded that the timing of the
amendment here affected Hranicky's substantial rights. See Tex. R. App. P. 44.2(b). 
Only the calculation mandated by the interplay of article 28.10(a) with
section 311.014(b) permits Hranicky to argue that the amendment gave him less than
ten days' notice. In point of calendar fact, he received the full ten days. We hold
harmless any error in the timing of the amendment. See Wright, 28 S.W.3d
at 531-32. 
         Also within the argument under his fourth and fifth issues, Hranicky asserts that
the original indictment charged him with an omission. The amendment, he argues,
improperly changed the offense to an act, entitling him to a re-indictment.


 "An
indictment may not be amended over the defendant's objection as to form or
substance if the amended indictment charges an additional or different offense or
if the substantial rights of the defendant are prejudiced." Tex. Code Crim. Proc. Ann.
art. 28.10(c) (Vernon 1989). 
         We first note that a "different offense," as article 28.10(c) uses the term,
means a different statutory offense. Flowers v. State, 815 S.W.2d 724, 728 (Tex.
Crim. App. 1991). Injury to a child by act and injury to a child by omission are
included in the same statutory offense. See Act of May 29, 1993, 73rd Leg., R.S.,
ch. 900 § 1.01, sec. 22.04, 1993 Tex. Gen. Laws 3622-23, 3766 (current version
at Tex. Pen. Code Ann. § 22.04(a)(1) (Vernon 2003)). The original indictment charged
Hranicky with reckless injury to a child by an act by allowing Lauren to enter the tiger
cage. Hranicky sought to quash the indictment, complaining that the State did not
provide adequate notice to him of the reckless act it relied on in charging him. The
State amended to include specific allegations of the reckless acts it intended to prove. 
We conclude that the amendment did not allege a different or additional offense. See
Flowers, 815 S.W.2d at 728. 
         Nonetheless, even if an amendment did not charge an additional or different
offense, it may be objectionable if it prejudices substantial rights of the accused. 
Flowers, 815 S.W.2d at 729. A substantial right is affected when the error had a
substantial and injurious effect or influence on the jury's verdict. King v. State,
953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776 (1946)). To determine if a substantial right has been violated, we
look retrospectively and review the record. Flowers, 815 S.W.2d at 729. On this
record, we cannot conclude that the amendment prejudiced Hranicky's substantial
rights. 
         Further, we note that the law of invited error estops a party from making an
appellate error of an action it induced. Prystash v. State, 3 S.W.3d 522, 531 (Tex.
Crim. App. 1999); Gonzalez v. State, 115 S.W.3d 278, 286 (Tex. App.–Corpus
Christi 2003, pet. ref'd). We conclude that Hranicky is estopped from complaining
that the State amended the indictment to include the specific allegations of
recklessness he requested. See Prystash, 3 S.W.3d at 531; see also Carpenter,
952 S.W.2d at 7 (finding amendment that conformed to accused's complaint was
invited error and precluded appellant from complaining about it on appeal). 
         Finally, also within the argument following his fourth and fifth issues, Hranicky
complains he did not receive ten days' notice between the State's second and third
amendments. He argues he is entitled to adequate time to compare the amendments
and determine if they affect his substantial rights. He notes that a motion to amend
cannot be served on the accused at the hearing on the motion, implying the
contemplation of some right to preparation time. He suggests that ten days is a
reasonable time. Hranicky cites no authority that requires the State to provide the
accused study time to compare amendments. We have found none. We decline
Hranicky's invitation to impose a timing requirement on the State's right to sequentially
amend a charging instrument. 
         We overrule Hranicky's fourth and fifth issues. We turn to his motion to quash.
3. Motion to Quash
         In his first issue, Hranicky asserts that the indictment, even as amended, does
not allege an offense. He argues that the State's use of the word "allowing" in the
indictment charged him with an omission, not an act. Reckless injury to a child is an
act of commission, he contends, not omission. Injury of a child by omission requires
an allegation in the indictment that the accused had a duty to act. See Hawkins v.
State, 910 S.W.2d 176, 179 (Tex. App.–Fort Worth 1995, no pet.). Hranicky
concludes that the trial court should have quashed the indictment and dismissed the
charges against him. 

a. Standard of Review
         This Court reviews a trial court's ruling on a motion to quash an indictment
under an abuse-of-discretion standard. Thomas v. State, 621 S.W.2d 158, 163 (Tex.
Crim. App. 1981) (en banc); Hankins v. State, 85 S.W.3d 433, 436 (Tex.
App.–Corpus Christi 2002, no pet.). As a general rule, a charging instrument that
tracks the language of a criminal statute possesses sufficient specificity to provide a
defendant with notice of a charged offense. State v. Edmond, 933 S.W.2d 120, 128
(Tex. Crim. App. 1996). The State need not allege facts that are merely evidentiary
in nature. Bynum v. State, 767 S.W.2d 769, 778 (Tex. Crim. App. 1989). 
b. Recklessness
          An accused is entitled to notice of the acts or omissions the State alleges the
accused committed. Daniels v. State, 754 S.W.2d 214, 217 (Tex. Crim. App. 1988). 
When recklessness is an element of an offense, the charging instrument must allege,
with reasonable certainty, the acts relied on to constitute recklessness. Tex. Code
Crim. Proc. Ann. art. 21.15 (Vernon 1989). Article 21.15 imposes two requirements
on a charging instrument alleging reckless misconduct. Hankins, 85 S.W.3d at 436
(citing State v. McCoy, 64 S.W.3d 90, 92 (Tex. App.–Austin 2001, no pet.)). First,
the indictment must allege the act or acts relied on to constitute the forbidden conduct
committed with recklessness. Hankins, 85 S.W.3d at 436. Second, the indictment
must allege the acts or circumstances relied on to demonstrate that the forbidden
conduct was committed in a reckless manner. Id. "[I]n no event shall it be sufficient
to allege merely that the accused, in committing the offense, acted recklessly or with
criminal negligence." Tex. Code Crim. Proc. Ann. art. 21.15 (Vernon 1989); see
Hankins, 85 S.W.3d at 437. 
         Here, the amended indictment alleged what acts constituted the forbidden
conduct by alleging the acts of:
asking and directing her to assist [him] in the cage, and by nodding his
head in the affirmative when [she] requested to enter the cage, and by
verbally giving [her] permission to enter the cage, and by walking
towards [her] to make sure a tiger did not go into the containment area
and closed the door after she entered the cage.

         We find that the indictment, as amended, alleged acts the State relied on to
constitute the forbidden conduct Hranicky committed with recklessness. See Tex.
Code Crim. Proc. Ann. art. 21.15 (Vernon 1989); see also Hankins, 85 S.W.3d
at 436. Further, the amended indictment alleged not merely that Hranicky acted
recklessly in causing serious bodily injury to the child, but that he did so by allowing
her to "enter a cage occupied by two (2) tigers." We also find that the indictment, as
amended, gave sufficient notice to Hranicky of the reckless manner in which he
engaged in the prohibited conduct. See Tex. Code Crim. Proc. Ann. art. 21.15
(Vernon 1989); see also Hankins, 85 S.W.3d at 436. 
c. Act or Omission
         An "act" is "a bodily movement, whether voluntary or involuntary and includes
speech." Tex. Pen. Code Ann. § 1.07(a)(1) (Vernon 2003). An "omission" is a failure
to act. Tex. Pen. Code Ann. § 1.07(a)(34) (Vernon 2003). For his proposition that the
indictment charges an omission and not an act and is therefore fatally defective,
Hranicky relies on Herring v. State, 633 S.W.2d 905, 909 (Tex. App.–Dallas 1982),
aff'd on other grounds, 659 S.W.2d 391 (Tex. Crim. App. 1983). The State charged
the accused in Herring with "allowing" another man to touch his genitals. Id. The
court of appeals found that the charging instrument charged the accused with
not preventing the touching. Id. at 909. Since not preventing the touching is
not an offense, the allegations did not charge a penal offense. Herring v. State,
659 S.W.2d 391, 392 (Tex. Crim. App. 1983) (en banc). 
         Here, the State did not charge Hranicky with failing to prevent Lauren's entry
into the tiger cage. As amended, the indictment charged Hranicky with acts that
granted Lauren access to the cage. The appellants in Hill v. State made an argument 
similar to Hranicky's. See Hill v. State, 881 S.W.2d 897, 901 (Tex. App.–Fort Worth
1994), aff'd, 913 S.W.2d 581(Tex. Crim. App. 1996). The State charged the Hills,
parents of a 13-year-old boy, with intentional injury to a child by omission. At trial,
the State proved they kept their son chained up and denied him food as punishment. 
Id. at 901. The son eventually starved to death. Id. at 903. On appeal, the Hills
asserted that the State charged an omission but proved only their actions. Id.
at 901-02. The court of appeals disagreed, characterizing the "appellant's argument
[as] simply a battle waged in semantics." Id. at 902. Even though the evidence "may
have been sufficient to support a conviction for injury to a child by actions," the Hill
court concluded, "it does not prevent the State from establishing the offense of injury
to a child by omission." Id. The State proved that the Hills acted in restraining their
child and also failed to act by not providing adequate nourishment. Id. at 902-93. 
         Applying the rationale of Hill to this case, the State had the option of choosing
whether to charge Hranicky with injury to a child by act or omission. See id. While
there may be sufficient evidence to support a conviction of injury to a child by
omission, it does not prevent the State from establishing the offense of injury to a
child by action. See id. Thus, while Hranicky might have failed to act by not
preventing Lauren's entry into the tiger cage, he also acted by asking her to assist him
in the cage, or by affirmatively giving her permission to enter the cage by either
nodding his head, verbally granting entry, or by closing the gate after Lauren entered
the cage. See id. We conclude that the indictment, as amended, charged Hranicky
with reckless acts, not an omission. Accordingly, it was unnecessary for the State to
allege Hranicky had a duty to act.


 
         Finally, we note that the amended indictment substantially tracks the language
of section 22.04 of the penal code. See Act of May 29, 1993, 73rd Leg., R.S.,
ch. 900 § 1.01, sec. 22.04, 1993 Tex. Gen. Laws 3622-23, 3766 (current version
at Tex. Pen. Code Ann. § 22.04(a)(1) (Vernon 2003)). Alternate pleading of the
differing methods of committing an offense may be charged in one indictment. 
Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991). 
         We find that the amended indictment was sufficient to apprise Hranicky of the
offense with which he was charged. See Daniels, 754 S.W.2d at 217. We also find
that the amended indictment set forth in plain and intelligible language sufficient
information to enable Hranicky to prepare his defense. See id. Accordingly, we hold
that the trial court did not abuse its discretion in denying his motion to quash. See
Hankins, 85 S.W.3d at 436. We overrule Hranicky's first issue. 
C. The Jury Charge
         In the relevant portion of the charge, the trial court asked the jury if Hranicky: 
did then and there recklessly, by an act, cause serious bodily injury to
Lauren Casey Villafana, a child, by allowing the said Lauren Casey
Villafana to enter a cage occupied by two (2) tigers, by asking or
directing her to assist the said Bobby Lee Hranicky in the cage, or by
nodding his head in the affirmative when Lauren Casey Villafana
requested to enter the cage, or by verbally giving Lauren Casey Villafana
permission to enter the cage, wherein . . . .

[Emphasis added.] The jury charge tracked the allegations in the amended indictment
that found support in the evidence. The trial court may charge the jury in
the disjunctive even if the indictment alleges in the conjunctive. See Kitchens,
823 S.W.2d at 258. We hold there is no error in the disjunctive charge. See id. 
We overrule Hranicky's sixth issue. 
III. SUFFICIENCY ANALYSES
         In issues two and three, Hranicky challenges the legal and factual sufficiency
of the evidence to support his conviction. We first address the standards and scope
of our legal-sufficiency review. 

A. Legal-Sufficiency Analysis
1. Legal-Sufficiency Standard and Scope of Review
          A legal-sufficiency challenge calls for appellate review of the relevant
evidence in the light most favorable to the prosecution. Jackson v. Virginia,
443 U.S. 307, 319 (1979); Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim.
App. 2003); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). We consider
all the evidence that sustains the conviction, whether properly or improperly admitted
or whether introduced by the prosecution or the defense, in determining the legal
sufficiency of the evidence. Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim.
App. 2001). Similarly, in reviewing the legal sufficiency of the evidence, we look to
all of the evidence introduced during either stage of the trial. De Garmo v. State,
691 S.W.2d 657, 661 (Tex. Crim. App. 1985). 
         Legal sufficiency in this case is measured against the elements of the offense
as defined by a hypothetically correct jury charge for the case. Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge
is one that "accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State's burden of proof or unnecessarily restrict the State's
theories of liability, and adequately describes the particular offense for which the
defendant was tried." Id. A hypothetically correct jury charge would not simply quote
from the controlling statute. Gollihar v. State, 46 S.W.3d 243, 254 (Tex. Crim.
App. 2001). Its scope is limited by "the statutory elements of the offense . . . as
modified by the charging instrument." Fuller v. State, 73 S.W.3d 250, 254 (Tex.
Crim. App. 2002) (Keller, P.J., concurring) (quoting Curry v. State,
30 S.W.3d 394, 404 (Tex. Crim. App. 2000)). When a statute lists more
than one method of committing an offense, and the indictment alleges some, but
not all, of the statutorily listed methods, the State is limited to the methods
alleged.  Fuller, 73 S.W.3d at 255; Curry, 30 S.W.3d at 404. This standard of legal
sufficiency ensures that a judgment of acquittal is reserved for those situations in
which there is an actual failure in the State's proof of the crime. Malik, 953 S.W.2d
at 240. We then determine if any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319;
Johnson, 23 S.W.3d at 7.
         In performing a legal-sufficiency review, we are mindful that the fact finder is
the exclusive judge of the credibility of witnesses and the weight to be given
testimony. Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Adelman v. State,
828 S.W.2d 418, 423 (Tex. Crim. App. 1992); Butts v. State, 835 S.W.2d 147, 151
(Tex. App.–Corpus Christi 1992, pet. ref'd). The fact finder may believe some
witnesses and refuse to believe others. Esquivel v. State, 506 S.W.2d 613, 615 (Tex.
Crim. App. 1974). It also may accept portions of a witness's testimony and reject
others. Id.; Butts, 835 S.W.2d at 151.
         If we reverse a criminal case for legal insufficiency following a jury trial, we
reform the judgment to reflect conviction for a lesser offense only if: (1) we find that
the evidence is sufficient to support conviction of the lesser offense; and (2) a jury
charge on the lesser offense was either submitted or requested but denied. Collier v.
State, 999 S.W.2d 779, 782 (Tex. Crim. App. 1999) (plurality op.) (discussing
circumstances under which court of appeals may reform judgment following jury trial
to reflect conviction for lesser offense); Bigley v. State, 865 S.W.2d 26, 27-28 (Tex.
Crim. App. 1993) (clarifying same). Otherwise, we vacate the judgment of conviction
for legal insufficiency and order a judgment of acquittal. Swearingen, 101 S.W.3d
at 95. 
2. The Hypothetically Correct Jury Charge
One of the ways a person commits injury to a child is by recklessly or with
criminal negligence, by act, causing a child serious bodily injury. Act of May 29,
1993, 73rd Leg., R.S., ch. 900 § 1.01, sec. 22.04, 1993 Tex. Gen. Laws 3622-23,
3766 (current version at Tex. Pen. Code Ann. § 22.04(a)(1) (Vernon 2003)). 
Therefore, the hypothetically correct jury charge for this case, as modified by the
amended indictment, would ask the jury if Hranicky: (1) recklessly or with criminal
negligence, (2) asked or directed Lauren to assist him in the cage, or (3) nodded his
head in the affirmative when Lauren requested to enter the cage, or (4) verbally gave
Lauren permission to enter the cage, (5) wherein one of the tigers did attack Lauren
by biting her about the neck with its mouth; (6) causing serious bodily injury to Lauren.
         Injury to a child is a "result-oriented" or "result of conduct" offense. Haggins
v. State, 785 S.W.2d 827, 828 (Tex. Crim. App. 1990); Alvarado v. State,
704 S.W.2d 36, 38-39 (Tex. Crim. App. 1985); Beggs v. State, 597 S.W.2d 375,
377 (Tex. Crim. App. [Panel Op.] 1980); Patterson v. State, 46 S.W.3d 294, 301
(Tex. App.–Fort Worth 2001, no pet.). Therefore, the culpable mental state relates
to the result of the conduct and not to the nature or the circumstances surrounding the
conduct. Haggins, 785 S.W.2d at 828. The definitions in the hypothetically correct
jury charge in this case concerning the applicable culpable mental state should be
limited to the result of the conduct, rather than the nature or the circumstances
surrounding the conduct. Banks v. State, 819 S.W.2d 676, 678-79 (Tex. App.–San
Antonio 1991, pet. ref'd).
         A person acts recklessly with respect to the result of conduct when the person
is "aware of but consciously disregards a substantial and unjustifiable risk" the result
will occur. Tex. Pen. Code Ann. § 6.03(c) (Vernon 2003). Further, "the risk must be
of such a nature and degree that its disregard constitutes a gross deviation from the
standard of care that an ordinary person would exercise under all the circumstances
as viewed from the actor's standpoint." Id. Criminal responsibility arises if the result
would not have occurred but for the conduct, "operating either alone or concurrently
with another cause, unless the concurrent cause was clearly sufficient to produce the
result and the conduct of the actor clearly insufficient." Tex. Pen. Code Ann. § 6.04(a)
(Vernon 2003). 
         For a concurrent cause to excuse liability, the accused's conduct must be clearly
insufficient, by itself, to produce the result. Id.; Robbins v. State, 717 S.W.2d 348,
351 (Tex. Crim. App. 1986). Further, the concurrent cause must be clearly sufficient,
by itself, to produce the result. Tex. Pen. Code Ann. § 6.04(a) (Vernon 2003);
Robbins, 717 S.W.2d at 351. 
         A fact finder may infer the accused's mental state from the acts, words, and
conduct of the accused and from the circumstances surrounding the acts in which the
accused engaged. See Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim.
App. 1991); Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978). 
An accused rarely facilitates conviction by admitting to the requisite intent or
knowledge. It seldom is possible to prove by direct evidence what an accused
intended or knew at the time of the incident. Thus, the fact finder usually must infer
intent and knowledge from circumstantial evidence rather than direct proof. 
See Gardner v. State, 736 S.W.2d 179, 182 (Tex. App.–Dallas 1987), aff'd,
780 S.W.2d 259 (Tex. Crim. App. 1989); see also Hernandez, 819 S.W.2d at 810;
Dillon, 574 S.W.2d at 94-95.
         Further, the fact finder may draw an inference of guilt from the accused's acts,
words, and conduct before, during, and after the incident. See Felder v. State,
848 S.W.2d 85, 98 (Tex. Crim. App. 1992) (presentation of false identification during
arrest indicated "consciousness of guilt" and awareness of need to conceal identity
from law enforcement); see also Butler v. State, 936 S.W.2d 453, 459 (Tex.
App.–Houston [14th Dist.] 1996, pet. ref'd) (corrected op.) (giving false identification
and engaging in violent outburst after arrest indicated accused's "guilty knowledge"
of assault for which he had been arrested).
         In his second issue, Hranicky challenges the sufficiency of the evidence on legal-sufficiency grounds. With a hypothetically correct jury charge in mind that reflects the
correct instructions and elements of the offense as modified by the indictment, we
turn to our legal-sufficiency analysis. 
3. Measuring the Legal Sufficiency of the Evidence 
against the Hypothetically Correct Jury Charge

         Hranicky focuses his legal-sufficiency argument on causation. He contends that
the tiger's attack was a concurrent cause sufficient by itself to produce the result. 
Conviction of a result-oriented offense cannot be based solely on a finding that the
accused intentionally or knowingly engaged in conduct that happened to cause the
result. Banks, 819 S.W.2d at 680. Instead, "what matters is that the conduct
(whatever it may be) is done with the required culpability to effect the result the
legislature has specified." Traxler v. State, 712 S.W.2d 268, 269 (Tex.
App.–Beaumont 1986, no pet.). With a result-oriented offense, a person is criminally
responsible if the result would not have occurred "but for" the actor's conduct. Tex.
Pen. Code Ann. § 6.04(a) (Vernon 2003); Umoja v. State, 965 S.W.2d 3, 8-9 (Tex.
App.–Fort Worth 1997, no pet.). "But for" causation can be established in two ways: 
(1) when the accused's conduct is clearly sufficient to produce the result; or (2) when
the accused's conduct plus another cause is sufficient to produce the result. Robbins,
717 S.W.2d at 351.
          Hranicky relies on Patterson, which states that convictions cannot stand merely
because a defendant is associated with the actual perpetrator of a crime. See
Patterson, 46 S.W.3d at 294. In Patterson, the defendant's boyfriend kidnapped her
children and murdered one of them. Id. at 298-99. The defendant delayed notifying
authorities and withheld her suspicion that her boyfriend had taken them. Id. She was
convicted of knowingly causing injury to a child by omission for failing to aid and
protect her children while they were being kidnapped, for failing to report to law
enforcement authorities and summon aid immediately when she knew the children had
been kidnapped, or for failing to report to the authorities that her boyfriend had
kidnapped the children. Id. at 299. The appellate court reduced her conviction to that
of reckless injury to a child after finding there was no evidence that she knew "to a
reasonable certainty that she could stop [the boyfriend] and thus prevent injury to the
children." Id. at 303-04. 
         We first distinguish Patterson by noting that the State had charged the accused
in that case with an omission. Id. at 299. Further, the State charged her with 
intentional injury to a child, not recklessness. Id. The facts of this case present a
circumstance more like that in Traxler. See Traxler, 712 S.W.2d at 269. There, the
accused kept, at a home occupied by a child, a dog known to be vicious and
dangerous to humans. Id. at 269. The dog bit the child about the head and neck. Id. 
The defendant was found guilty of reckless injury to a child. Id. In one of his issues
on appeal, he contended that his conduct was insufficient to produce the injuries. Id. 
The court of appeals overruled his causation issue, holding that an animate object,
such as a dog, could be the manner and means for accomplishing an assault. Id.
at 270 (citing Garret v. State, 619 S.W.2d 172, 175 (Tex. Crim. App [Panel
Op. 1981)). 
         Applying Traxler to the facts of this case, a tiger, like a dog, is an animate
creature that could be the manner and means for accomplishing injury to a child. See
Traxler, 712 S.W.2d at 270. As with the defendant in Traxler, Hranicky was aware
of the risk. See id. at 269. The dog was known to be dangerous to humans; the tiger
was known to view children as prey. See id. Accordingly, we find that Hranicky's
actions, in conjunction with the tiger, were the "but for" causes of Lauren's death. 
See Robbins, 717 S.W.2d at 351. Viewing the evidence in the light most favorable
to the State, we conclude that any rational trier of fact could have found beyond a
reasonable doubt that Hranicky caused Lauren's death. See Jackson, 443 U.S.
at 319; see also Johnson, 23 S.W.3d at 7. Accordingly, we hold the evidence legally
sufficient to support Hranicky's conviction for reckless injury to a child. See Jackson,
443 U.S. at 319; see also Johnson, 23 S.W.3d at 7. We overrule Hranicky's second
issue.  
 B. Factual-Sufficiency Analysis
1. Factual-Sufficiency Standard and Scope of Review
         This Court measures the factual sufficiency of the evidence in this case against
a hypothetically correct jury charge. Adi v. State, 94 S.W.3d 124, 131 (Tex.
App.–Corpus Christi 2002, pet. ref'd); see Malik, 953 S.W.2d at 240. We are
constitutionally empowered to review the judgment of the trial court to determine the
factual sufficiency of the evidence used to establish the elements of the charged
offense. Johnson, 23 S.W.3d at 6. In determining the factual sufficiency of the
elements of the offense, we view all the evidence neutrally, not through the prism of
"the light most favorable to the prosecution." Id. at 6-7 (citing Clewis v. State,
922 S.W.2d 126, 129 (Tex. Crim. App. 1996)). We set aside a finding of guilt only
if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. Johnson, 23 S.W.3d at 7. A clearly wrong and unjust finding of guilt is
"manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." Rojas
v. State, 986 S.W.2d 241, 247 (Tex. Crim. App. 1998).
         In conducting a factual-sufficiency review, we review the fact finder's weighing
of the evidence. Johnson, 23 S.W.3d at 7 (citing Clewis, 922 S.W.2d at 133). We
review the evidence that tends to prove a material disputed fact and compare it with
evidence that tends to disprove it. Johnson, 23 S.W.3d at 7. We are authorized to
disagree with the fact finder's determination. Id. However, we approach a factual-
sufficiency review with appropriate deference to avoid substituting our judgment for
that of the fact finder. Id. Our evaluation should not intrude substantially on the fact
finder's role as the sole judge of the weight and credibility given to witness testimony. 
Id.
         We always remain aware of the fact finder's role and unique position, a position
we are unable to occupy. Id. at 9. Exercise of our authority to disagree with the fact
finder's determination is appropriate only when the record clearly indicates our
intervention is necessary to stop manifest injustice. Id. Otherwise, we accord due
deference to the fact finder's determinations, particularly those concerning the weight
and credibility of the evidence. Id.
         Every fact need not point directly and independently to the accused's guilt. 
Vanderbilt v. State, 629 S.W.2d 709, 716 (Tex. Crim. App. 1981). A finding of guilt
can rest on the combined and cumulative force of all the incriminating circumstances. 
Id. When an appellant challenges the factual sufficiency of the elements of the
offense, we ask whether "a neutral review of all the evidence . . . demonstrates that
the proof of guilt is so obviously weak as to undermine confidence in the jury's
determination, or the proof of guilt, although adequate if taken alone, is greatly
outweighed by contrary proof." Zuliani v. State, 97 S.W.3d 589, 593-94 (Tex. Crim.
App. 2003) (quoting Johnson, 23 S.W.3d at 11); see Swearingen, 101 S.W.3d at 97. 
         In conducting a factual-sufficiency review in an opinion, we "show our work"
when we consider and address the appellant's main argument for urging insufficiency
of the evidence. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003);
Johnson, 23 S.W.3d at 9; Manning v. State, 112 S.W.3d 740, 747 (Tex. App.–
Houston [14th Dist.] 2003, pet. denied); see Tex. R. App. P. 47.1. This practice
benefits the parties, maintains the integrity of the justice system, and improves
appellate practice. Sims, 99 S.W.3d at 603; Manning, 112 S.W.3d at 747. If we
reverse a criminal case for factual insufficiency, we vacate the judgment of conviction.
 Clewis, 922 S.W.2d at 133-34. We remand for a new trial a criminal case reversed
for factual insufficiency, so a second fact finder has the chance to evaluate the
evidence. Swearingen, 101 S.W.3d at 97.
2. Measuring the Factual Sufficiency of the Evidence 
against the Hypothetically Correct Jury Charge

a. The Main Factual-Sufficiency Arguments
         In his factual-sufficiency challenge, Hranicky reasserts the causation issue he
raised in his legal-sufficiency claim. He also raises the issue of intent, arguing that his
conduct does not represent a gross deviation from the standard of care. 
(1) Awareness of Risk
         Viewing all the evidence neutrally, favoring neither the prosecution nor Hranicky,
in addition to the evidence analyzed in our legal-sufficiency analysis, the record reflects
that each of the witnesses who came into contact with Hranicky in connection with 
the tigers testified they told him that: (1) large cats, even those raised in captivity, are
dangerous, unpredictable wild animals; and (2) children were particularly at risk from
adolescent and adult tigers, especially males. Expert animal handlers whom Hranicky
consulted and written materials he claimed to have read warned Hranicky that the risks
increased with adolescent male tigers, with more than one person in the cage, with
more than one tiger in the cage, at dusk during the animals' heightened activity period,
and when diminishing one's size by sitting or crouching on the ground. They each
cautioned that tigers attack swiftly, without warning, and are powerful predators. 
         Further, Hranicky's initial story to Sapp that Lauren had sneaked into the cage
evidences Hranicky's awareness of the risk. The jury also could have inferred his
awareness of the risk when he concealed from Sapp that the family was purchasing
the tigers for Lauren. See Felder, 848 S.W.2d at 98. The jury also could have inferred
Hranicky's consciousness of guilt when he gave several different versions of what
happened. See id. 
         On the other hand, the record shows that before buying the tigers, Hranicky
researched the subject and conferred with professionals. He received training in
handling the animals. Further, Kelly Hranicky testified she also understood the
warnings about not allowing children in the tiger cage to apply to strangers, not to
Lauren. Hranicky told the grand jury he did not think the warnings applied to children,
like Lauren, who had helped raise the animal. He said he had seen other handlers,
including Sapp and McAda, permit Lauren and other children to go into tiger cages. 
He testified Currer told him it was safe to permit children in tiger cages. Further, while
the State's witness described zoo policies for handling tigers, those policies were not
known to the general public. Finally, none of the significant figures in Lauren's life
fully appreciated the danger the tigers posed for Lauren. Hranicky was not alone in not
perceiving the risk. 

(2) Substantial and Unjustifiable Risk and Gross Deviation 
from the Standard of Care

         Hranicky testified to the grand jury he did not view the risk to be substantial
because he thought the tigers were domesticated and had bonded with the family. He
claimed not to have any awareness of any risk. The tigers were acting normally. 
Lauren had entered the cage numerous times to pet the tigers with no incident. 
Further, he asserted, other than a minor scratch by the male as a cub, the tigers had
never harmed anyone. Thus, he argues, he had no knowledge of any risk. 
         Viewing all the evidence neutrally, favoring neither Hranicky nor the State, we
find that proof of Hranicky's guilt of reckless injury to a child is not so obviously weak
as to undermine confidence in the jury's determination. See Zuliani, 97 S.W.3d
at 593-94. Nor do we do not find that the proof of his guilt is greatly outweighed by
contrary proof. See id. We overrule Hranicky's third issue.
IV. AUTOPSY PHOTOGRAPHS
         In his seventh issue, Hranicky contends the trial court abused its discretion by
allowing autopsy photographs into evidence. The State introduced the photographs
during the testimony of Dr. Robert J. Bayardo, chief medical examiner for Travis
County. Bayardo performed the autopsy on Lauren. 
A. Bayardo's Testimony
         Using the autopsy photographs, the medical examiner described Lauren's
injuries. She had a large tear in her throat and multiple puncture wounds on her neck
from the tiger's canine teeth. She had scrapes and bruises on her head and face. She
also suffered superficial internal puncture wounds from the tiger's front fangs, a
"through and through" wound on her left lower lip, another wound under her chin, and
a tear wound above her left clavicle. She also had sustained smaller incisor tip
wounds in between the larger wounds and on the back of her neck and upper back. 
Her legs showed multiple scrapes on the knees and feet consistent with "somebody
being dragged over rough pavement." Bayardo described the throat wound as being
two inches in length and penetrating all the way down to the spine. The child's spine
had been snapped and the spinal cord severed. Bayardo did not believe she survived
the severance of her spinal cord. Lauren died from "tiger bites of the neck, which
fractured the neck, transected the spinal cord, and punctured the throat."  
B. Preservation of Error
         By motion in limine and objection, Hranicky sought to keep autopsy photographs
of Lauren out of evidence. He first objected that the photographs had no relevance
to any contested issue of fact in the case. He asserted he tendered a stipulation of
evidence of the only issues to which the photographs were relevant, that is, that the
tiger attacked Lauren, caused serious bodily injury by biting her in the neck, and killed
her. He also argued that the photographs were more prejudicial than probative. See
Tex. R. Evid. 403. 
         The trial court sustained Hranicky's objections to four photographs and initially
overruled them as to three others. Bayardo testified from the three admitted
photographs in explaining Lauren's fatal wounds. He showed the photographs to the
jury during his testimony, apparently from the witness chair.


 He explained to the jury
that one of the photographs depicted the large wound to Lauren's neck. Another
showed the puncture wounds in Lauren's body and smaller wounds from the tiger's
front fangs. The third portrayed the scrapes on Lauren's knees, ankles, and feet
inflicted when the tiger dragged her across the cage. At the conclusion of the medical
examiner's testimony, the State moved to publish the photographs to the jury. The
trial court denied the State's request. 
         Later, after the jury had delivered its guilty verdict and before the punishment
phase, the trial court struck the photographs from the record. Hranicky did not ask the
court to instruct the jury not to consider the photographs for any purpose during the
punishment phase. He did not move for a mistrial. On appeal, Hranicky contends the
trial court abused its discretion in admitting the photographs into evidence in the first
place. 
C. Evidentiary Standard of Review
         We review a trial court's admission or exclusion of evidence under an abuse-of-discretion standard. Montgomery v. State, 810 S.W.2d 372, 378-80 (Tex. Crim.
App. 1990). An abuse of discretion occurs when the trial court acts arbitrarily or
unreasonably, without reference to guiding rules or principles. Id. at 380. In other
words, an abuse of discretion occurs only when the trial court's decision is so wrong
as to lie outside that zone within which reasonable persons might disagree. Id. A trial
court has a "limited right to be wrong." Id. Our inquiry on appeal is whether the
result was reached in an arbitrary or capricious manner. Id. 
D. Analysis
1. Admissibility
         To be admissible, evidence must be relevant. Tex. R. Evid. 402. Relevant
evidence is evidence having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than
it would be without the evidence. Tex. R. Evid. 401. Although relevant, evidence may
be excluded if its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, misleading the jury, by considerations of undue
delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403; Mozon v.
State, 991 S.W.2d 841, 846-47 (Tex. Crim. App. 1999). In other words, rule 403
favors the admission of relevant evidence and carries the presumption that relevant
evidence will be more probative than prejudicial. Tex. R. Evid. 403; Rivera v. State,
130 S.W.3d 454, 460 (Tex. App.–Corpus Christi 2004, no pet. h.) (citing Phelps v.
State, 5 S.W.3d 788, 795 (Tex. App.–San Antonio 1999, pet. ref'd)). In reviewing
the trial court's balancing of probative value with prejudice, we reverse the trial court's
judgment "rarely and only after a clear abuse of discretion." Rivera, 130 S.W.3d
at 460 (citing Montgomery, 810 S.W.2d at 378-80). 

2. Relevancy
         Evidence is presumed relevant on its face. Resse v. State, 33 S.W.3d 238, 240
(Tex. Crim. App. 2000). A photograph is relevant if it is used to show injuries and the
cause of death. See Tex. R. Evid. 401; Wyatt v. State, 23 S.W.3d 18, 29 (Tex. Crim.
App. 2000); see Lander v. State, 868 S.W.2d 417, 426 (Tex. App.–Tyler 1993, pet.
ref'd) (noting that autopsy or post-autopsy photographs can be used to illustrate
injuries and reveal cause of death). "Like other demonstrative evidence, photographs
should assist the jury with its decision, whether that be deciding guilt or punishment." 
Erazo v. State, No. 2206-02, 2004 Tex. Crim. App. LEXIS 1007, at *11 (Tex. Crim.
App. June 16, 2004). "A photograph should add something that is relevant,
legitimate, and logical to the testimony that accompanies it and that assists the jury
in its decision-making duties." Id. 
         When an accused pleads not guilty to an offense and puts the State to the
burden of proving all essential facts, we do not consider the accused's admission of
an essential fact in determining the relevancy of any particular piece of evidence. 
Blackburn v. State, 820 S.W.2d 824, 826 (Tex. App.–Waco 1991, pet. ref'd). 
Further, we are mindful that where there is room for reasonable disagreement on the
issue of relevance, "an appellate court that reverses a trial court's ruling on relevancy
accomplishes nothing more than to substitute its own reasonable perception
of common experience for that of the trial court." Montgomery, 810 S.W.2d at 391. 
We hold that the trial court did not abuse its discretion in finding the three autopsy
photographs relevant in the culpability phase of the trial. See id. However, Hranicky's
stipulations do factor into our balancing of the probative value of the photographs
against their possible prejudicial effects. See Blackburn, 820 S.W.2d at 826. 
3. The Balancing of Probative Value with Prejudice
         Evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the issues, misleading the jury, by
considerations of undue delay, or needless presentation of cumulative evidence. Tex.
R. Evid. 403. We employ a four-prong test in reviewing a trial court's evidentiary
ruling under rule 403: (1) the probative value of the evidence; (2) the potential to
impress the jury in some irrational, yet indelible, way; (3) the time needed to develop
the evidence; and (4) the proponent's need for the evidence. Erazo, 2004 Tex. Crim.
App. LEXIS 1007, at *4; Montgomery, 810 S.W.2d at 389-390. In the context of
photographs, we also consider the number of photographs, their size, whether they
are gruesome, whether any bodies are clothed or naked, and whether the body has
been altered by autopsy. Erazo, 2004 Tex. Crim. App. LEXIS 1007, at *4; Wyatt, 23
S.W.3d at 29. We are not limited to this list. We also consider the availability of
other means of proof and the circumstances unique to each individual case. Erazo,
2004 Tex. Crim. App. LEXIS 1007, at *4. 
         The State argues it offered the photographs to explain the events of June 6,
1999. It also offered the photographs to show from which direction the tiger attacked
and what happened to Lauren after the initial attack. Color autopsy photographs that
accompany the testimony of a pathologist generally are more probative than
prejudicial. Chamberlain v. State, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999). 
Hranicky argues that: (1) the photographs merely corroborated the medical examiner's
testimony; and (2) their probative value was insignificant compared to their
inflammatory nature. See id. 
         We first note that the court of criminal appeals has rejected "the premise that
visual evidence accompanying oral testimony is cumulative of the testimony or that
it is of insignificant probative value." Id. at 236-37. Next, within his motion in limine
with regard to the photographs, Hranicky offered a stipulation that he did not dispute
that the tiger attacked Lauren and caused her serious bodily injury that resulted in her
death. He stipulated that "the jury can be instructed that the State need not prove the
serious bodily injury, the attack by the tiger, or the biting in the throat." Although the
photographs may have probative value, they must also assist the jury in deciding a
disputed fact issue. Krishnan v. Ramirez, 42 S.W.3d 205, 219 (Tex. App.–Corpus
Christi 2001, pet. denied). Hranicky's counsel argued at trial, and continues to argue
on appeal, that since Hranicky tendered a stipulation of the evidence as to the only
issues to which the photographs may be relevant (that the tiger attacked Lauren, bit
her in the neck, and killed her), the photographs' prejudicial effect outweighed their
probative value. 
         However, "stipulation" is a technical term. Article 1.15 of the code of criminal
procedure provides that evidence may be stipulated if the defendant consents in
writing and waives, in open court, the appearance, confrontation, and
cross-examination of witnesses and further consents either to an oral stipulation of the
evidence and testimony or to the introduction of testimony by affidavits, written
statement of witnesses, and any other documentary evidence in support of the
judgment of the court. See Tex. Code Crim. Proc. Ann. art. 1.15 (Vernon 1977). 
Further, the waiver and consent must be approved by the court in writing and be filed
with the court's papers of the cause. Id. "However, stipulations, oral or written,
in criminal cases where the plea of not guilty is entered before the jury do not
have to comply with Art. 1.15." McClain v. State, 730 S.W.2d 739, 742 n.1 (Tex.
Crim. App. 1987) (citing Messer v. State, 729 S.W.2d 694, 699 (Tex. Crim.
App. 1987)). Stipulations documented in the reporter's record that clearly indicate the
trial court considered the stipulations are treated as evidence. Lara v. State,
962 S.W.2d 148, 149-50 (Tex. App.–San Antonio 1998, no pet.). 
         In Lara, the prosecutor asked the court to take judicial notice of the stipulations. 
Id. at 149. The stipulations did not appear in the appellate record. Id. Lara argued
there was no evidence in the record to support the trial court's judgment. Id. 
However, the reporter's record showed that the trial court considered the stipulations. 
Id. at 150. Accordingly, the court of appeals held the evidence sufficient to support
the State's allegation. Id. at 151. 
         Here, the jury charge did not instruct the jury that the parties had stipulated to
and did not contest the facts that Hranicky argues were removed from contention by
his stipulation. On the other hand, we note that "serious bodily injury," to which
Hranicky argues he stipulated, was defined in the jury charge. Also, the other
elements of the State's case Hranicky argues were covered by the stipulation also
appear in the jury charge. Nonetheless, we conclude that the trial court considered the
stipulation offered in Hranicky's motion in limine, since there was no dispute about
how the child died. The question is whether the probative value of the photographs
outweighed their prejudicial effect. 
         Photographs that prove death have probative value. Juhasz v. State,
827 S.W.2d 397, 402 (Tex. App.–Corpus Christi 1992, pet ref'd). Further,
photographs sufficiently tied to the facts of the case that aid the jury in resolving
jurors' questions are probative. Krishnan, 42 S.W.3d at 219. Here, the photographs
aided the medical examiner in explaining the manner of Lauren's death. The
photographs assisted the jury in visualizing the events. They depicted horrific wounds
on the nude body of a child and were no doubt disturbing to the jurors. Nonetheless,
they also showed how small Lauren was in comparison to the size of the wounds and
teeth marks left by the tiger. Finally, the photographs illustrated the power and
ferocity of the tiger more than any mere verbal description could. 
4. The Potential to Impress the Jury in Some Irrational Yet Indelible Way
         When images appeal to a jury's emotions and encourage the jurors to make a
decision on an emotional basis, the evidence weighs strongly in favor of exclusion. 
Erazo, 2004 Tex. Crim. App. LEXIS 1007, at *22; Resse, 33 S.W.3d at 242. In
Resse, the trial court admitted a photograph of the victim and her unborn child lying
in a casket together. Resse, 33 S.W.3d at 239. The photograph did not show the
manner or method of the victim's death. Id. at 240. It did not show the way or
process by which the victim was killed. Id. One cannot tell from the picture how the
victim died. Id. at 242 ("The unborn child in the photograph appears tiny, innocent,
and vulnerable."). The court held that the photograph had an impact that encouraged
the jury to make a decision on an emotional basis and not on the basis of the other
relevant evidence introduced at trial. Id. 
         Unlike Resse, the photographs here show the manner of the victim's death. The
jury was undoubtedly affected emotionally by the photographs. We cannot conclude,
however, that the photographs had such an impact that the jury's decision was made
on an emotional basis and not on the basis of the other relevant evidence introduced
at trial. See id. We note that the trial court minimized the emotion effect of the
photographs by limiting them in number and by not permitting the State to publish the
photographs to the jury. 
5. The Time Needed to Develop the Evidence
         When the State takes little time to introduce photographs, admissibility is
favored. Erazo, 2004 Tex. Crim. App. LEXIS 1007, at *22-*23; Resse, 33 S.W.3d
at 242-243. Here, it took the State very little time to lay the foundation for the
photographs and introduce them into evidence. See Reese, 33 S.W.3d at 242. The
State introduced them during the medical examiner's testimony as demonstrative
evidence to assist visually in the witness's explanation of Lauren's wounds. The
medical examiner's testimony covered 17 pages in the record. The presentation of 
evidence in the whole trial spanned over 360 pages. Thus, only five percent of the
jury's time was occupied with the testimony about the photographs. Therefore, the
jury's attention was not significantly diverted by the photographs because of the time
involved in presenting the medical examiner's testimony. See Horton v. State,
986 S.W.2d 297, 303 (Tex. App.–Waco 1999, no pet.) (holding that 18 pages out
of 332 pages of evidence did not significantly divert jury's attention from central
issue). 
6. The State's Need for the Evidence
         We ask three questions when analyzing the State's need for the evidence:
"(1) Does the proponent have other available evidence to establish the fact of
consequence that the [photograph] is relevant to show? (2) If so, how strong is that
other evidence? (3) And is the fact of consequence related to an issue that is in
dispute?" Erazo, 2004 Tex. Crim. App. LEXIS 1007, at*23; Reese, 33 S.W.3d
at 242. 
         In Resse, the State had other photographs, admitted during the culpability
phase, which served proper purposes. Resse, 33 S.W.3d at 242. The State offered
and the jury saw photographs from the crime scene and from the autopsies of the
victims. Id. The court of appeals held, because the State had other photographs that
would have been proper to use in depicting the death of the victims, that the balance
weighed in favor of excluding photographs depicting the victim and her unborn child
in a coffin. Id. at 242-243. Similarly, in Erazo, the photograph at issue depicted a
fetus on a table. Erazo, 2004 Tex. Crim. App. LEXIS 1007, at*24-*25. Testimony
from the medical examiner and photographs of the victim had established during the
guilt phase that the victim was pregnant and that the fetus had died. Id. at *24. 
Furthermore, the facts of consequence that the photograph was admitted to show
were not in dispute. Id. at *24. Therefore, the court of criminal appeals concluded
that the photograph of the fetus was inadmissable. Id. at *24-*25. 
         Here, the State offered the autopsy photographs to show the manner or method
of Lauren's death. Resse held similar photographs admissible. Resse, 33 S.W.3d
at 242. Although testimony from the medical examiner had established the fact that
Lauren died, the burden rested with the State to prove all the elements of the crime. 
The strength of the evidence available to the State was not as strong without the
photographs. 
         Finally, we note that the photographs were not enlargements but small prints. 
The medical examiner did refer to the photographs during his testimony. However, we
again note that the trial court did not permit the prosecution to publish the
photographs to the jury. 
         Accordingly, we conclude, through a thorough analysis of the relevant factors,
that the autopsy photographs were more probative than prejudicial. We hold that the
trial court did not abuse its discretion in admitting the photographs. See Montgomery,
810 S.W.2d at 391. We overrule Hranicky's seventh issue. 
V. CONCLUSION
         Having overruled each of Hranicky's seven issues, we affirm the judgment and
sentence of the trial court. 
                                                               ERRLINDA CASTILLO
                                                               Justice
Do Not Publish.
Tex. R. App. P. 47.2(b). 

Opinion delivered and filed
this 12th day of August, 2004.