**Jay Mahlon HILL and Linda Maria Lembo Hill, Appellants,**

v.

**The STATE of Texas, State.**

**Nos. 2–92–353–CR, 2–92–354–CR.**

Court of Appeals of Texas, Fort Worth.

July 28, 1994.

---

David L. Richards and Robert Ford, Fort Worth, for appellants.

Tim Curry, Crim. Dist. Atty., Betty Marshall, Charles M. Mallin, Assistants Chief Appellate Section and Tanya S. Dohoney, Asst. Crim. Dist. Atty., Fort Worth, for appellee.

Before WEAVER, HICKS and FARRAR, JJ.

OPINION

WEAVER, Justice.

Appellants, Jay Mahlon Hill and Linda Maria Lembo Hill, who are a married couple, were each charged in separate indictments for the offense of injury to a child by omission. *See* TEX.PENAL CODE ANN. § 22.04 (Vernon Supp.1994). The indictments alleged that each appellant "intentionally and knowingly, by omission, [caused] disfigurement and deformity, serious bodily injury, and serious physical and mental deficiency and impairment to Stephen Hill, a child younger than fifteen years of age, by failure to provide food and medical care" to Stephen when they had a legal duty as parents to do so. Essentially, appellants were charged with starving their thirteen-year-old son to death.

Appellants were tried together before a jury. The jury found each appellant guilty of the charged offense and sentenced them each to ninety-nine years' confinement in the Institutional Division of the Texas Department of Criminal Justice. The jury also made an affirmative finding on the use of a deadly weapon with respect to each appellant.

Because appellants were tried together, and because they present identical issues on appeal, appellants have filed a joint brief. Appellants challenge their convictions through six points of error. In points one and two appellants challenge the sufficiency of the evidence to support their convictions for injury to a child by omission, and in points three through six appellants challenge the affirmative finding of use of a deadly weapon. Because the evidence is sufficient to support appellants' convictions, and because there is no error with respect to the affirmative finding on the use of a deadly weapon, we overrule appellants' points of error and affirm the judgments of the trial court with respect to each appellant.

**FACTUAL BACKGROUND**

On the morning of November 3, 1991, the dispatcher for the White Settlement Police Department received a 911 hang-up call. The dispatcher returned the call and learned that appellant, Mrs. Hill, had called 911 but hung-up before the dispatcher could answer. Mrs. Hill told the dispatcher she and her husband had not been very good parents because, as a form of discipline, they had not been feeding their child.

Emergency Medical Technicians (EMTs) were dispatched to appellants' home, a small travel trailer, where they found Stephen Hill in full pediatric arrest. The first impressions of the three EMTs that attended to Stephen were vivid ones. They each believed he was in the final stages of a long-term illness or terminal disease such as cancer or AIDS. None of the EMTs recognized Stephen's physical appearance as that of a thirteen-year-old boy. They each believed him to be only six to eight years old. Stephen was taken to the hospital where he remained comatose until his death.

Medical experts concluded Stephen died of severe malnutrition brought about by food deprivation. Although appellants admitted to withholding food from Stephen for approximately three to four months, the medical experts believed the starvation occurred over a much longer period of time, probably over the course of several years. In fact, the malnutrition Stephen was suffering from was so severe his body was deteriorating by "eating itself."

By examining medical records from Stephen's younger years, medical experts were able to determine that Stephen experienced a normal pattern of growth during the first several years of his life. However, Stephen's growth chart simply flat-lined around the age of nine. During the four to five years preceding his death, Stephen only grew one inch in height and he did not gain any weight. The cause of this sudden stoppage in growth was malnutrition. Experts opined that if Stephen had been properly nourished he would have grown eight to ten inches taller and gained thirty to thirty-five pounds or more during this time period.

Douglas Hill, Stephen's younger brother,[1] testified at trial and explained what life with his parents was like for him and Stephen.

---

1. Douglas was almost thirteen years old at the   time of trial.

According to Douglas, appellants had been withholding food as punishment for approximately five to six years. The boys would sometimes go three to four days without food, and when they did eat, it was usually bologna and cheese sandwiches. However, on many occasions appellants would sabotage the boys' food so that it would not taste good. Sometimes the boys would have cereal with pepper in it, and on other occasions appellants would pour vinegar into the boys' milk and make them drink the curdled mixture. On the day before Stephen was rushed to the hospital, appellants fixed him a nutrient drink with a lot of pepper, garlic and vinegar mixed in so that the drink would not taste good.

Although appellants often deprived their children of food, they would tend to their own gastric needs with hamburgers, pizza and food from other fast food restaurants and cafeterias. Douglas testified that he and Stephen would get to share in these meals every once in a while, but not very often.

Appellants initially had a rule that if the boys were hungry, they had to ask for food before they could have any. This rule was later changed and the boys would be punished just for asking for some food. Douglas testified that if he was hungry he would "[j]ust be hungry." However, Stephen apparently chose to fend for himself and he was caught taking food from the kitchen. Therefore, Douglas testified that to prevent Stephen from getting food on his own, appellants chained him up with a chain, a metal pipe or rod, locks and a belt. According to Douglas, this went on for approximately one and a half years.

While they were at the hospital, appellants admitted to a police officer that they had chained Stephen to a cabinet door by using a chain and a padlock around his wrist or ankle, but claimed this was done because Stephen would get up at night and leave the travel trailer. Appellants began using the chain and padlock when their first method of restraint, a sheet, had failed to secure Stephen.

When the restraint first began, Douglas was allowed to unchain Stephen if he needed to go to the bathroom. However, as time passed, Stephen was forced to live and sleep on a plastic-covered mattress pad in the hallway of appellants' small trailer, and he was not even allowed to urinate in the bathroom. Douglas testified that Stephen was chained to the cabinet because "he didn't do the punishment right." In fact, on the day before he was taken to the hospital, Stephen was told not to even look into the kitchen. When Stephen disobeyed this order, appellants put a paper sack over his head.

Appellants' heinous treatment of Stephen went undetected by the outside world because Mrs. Hill had removed the two boys from school and began teaching them at home several years before Stephen's death. Douglas testified that Mrs. Hill originally taught the boys on a regular basis, but eventually she stopped teaching them anything. Appellants also hid their crime by other means, such as removing Stephen from the trailer when repairs were being made. Additionally, the boys were told to lie to a social worker and tell her they were sleeping on the couch and were eating just fine. Thus, this offense went undetected until the morning of November 3, 1991, when after a week during which Stephen could not speak or move, other than making some unintelligible grunting noises, Mrs. Hill made the call to the 911 dispatcher.

## SUFFICIENCY OF THE EVIDENCE

In their first two points of error, appellants challenge the sufficiency of the evidence to support their conviction for injury to a child *by omission*. In point one appellants simply allege the evidence is legally insufficient to sustain their conviction, and in point two appellants contend that, when measured by the charge, the evidence is insufficient to sustain their conviction. Appellants essentially argue that while the evidence may have been sufficient to support a conviction for injury to a child due to their "actions," the evidence is not sufficient to support their conviction for injury to a child "by omission," the offense appellants were charged with in their indictments, and the offense alleged in the charges to the jury.

In reviewing the sufficiency of the evidence, the evidence is viewed in the light most favorable to the verdict. *Flournoy v. State*, 668 S.W.2d 380, 383 (Tex.Crim.App. 1984). The issue on appeal is not whether we as a court believe the prosecution's evidence or believe that the defense evidence "outweighs" the State's evidence. *See Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim. App.), *cert. denied*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). We are not to sit as a thirteenth juror and reweigh the evidence to determine whether we believe the evidence established the elements beyond a reasonable doubt. *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App.1989) (opinion on reh'g). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex.Crim.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). This standard of review gives full play to the responsibility of the trier of fact fairly to resolve conflicts, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). Furthermore, "this standard must be applied to the evidence and to a correct charge that corresponds to the indictment allegations." *Reeves v. State*, 806 S.W.2d 540, 543 (Tex. Crim.App.1990), *cert. denied*, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). There must be an interaction between the indictment, the proof, and the charge. *Id.*; *Benson v. State*, 661 S.W.2d 708, 715 (Tex. Crim.App.1982), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).

In the present case, the indictments charged each appellant with injury to a child by omission, *i.e.*, by failing to provide Stephen with food and medical care when they had a legal duty to do so. Likewise, each jury charge sought to determine if appellants did intentionally and knowingly, by omission, cause serious bodily injury to Stephen by failing to provide food or medical care at a time when they had a legal duty to do so.[2] Thus, there is proper interaction between the indictments and the charges. The only question remaining is whether there is also proper interaction with the proof presented during trial.

As appellants point out, under the Texas Penal Code, " '[o]mission' means failure to act." TEX.PENAL CODE ANN. § 1.07(23) (Vernon 1974). However, appellants argue they never failed to act in depriving Stephen of food, and that no "omission" ever occurred on their part during the commission of this offense. Appellants contend that from the outset of this case, contrary to the indictments and jury charges, the State argued and proved appellants intentionally and knowingly "acted" in committing the charged offense. Appellants further contend they "acted at every turn of this offense." Appellants base their argument on the fact they "restrained" Stephen by chaining him up with a chain, a metal rod, locks and a belt.

Appellants do not contest the fact that as parents, they had a legal duty to provide Stephen with appropriate food and medical care. Rather, appellants argue that in failing to fulfill this duty they engaged in a course of affirmative action, and not a course of omission. Appellants cite no authority in support of their position that they did not engage in a course of omission. They simply state throughout their brief that the evidence overwhelmingly established they "acted in" starving Stephen, and they "acted in" depriving Stephen of food. However, we agree with the State that appellants' argument is simply a battle waged in semantics.

It is true appellants took action when they chained Stephen to a cabinet door for the one and a half year period preceding his death. While this conduct in and of itself may have been sufficient to support a conviction for injury to a child by actions, it does not prevent the State from establishing the offense of injury to a child by omission. At the same time appellants "acted" in restrain-

2. Each jury charge also alleged two different ways each appellant could be guilty of the charged offense as a party to that offense.

ing Stephen, they also failed to act by failing to provide him with adequate nourishment.

The overwhelming evidence presented at trial established that appellants did not provide Stephen with adequate nourishing food. Not only did they not provide him with appropriate nourishment during the one and a half year period he was chained to a cabinet, the evidence also established they did not provide him with appropriate nourishment for the three to four year period prior to restraining Stephen. The medical experts concluded Stephen suffered from chronic malnourishment which occurred over a period of several years. In other words, Stephen starved to death.

To "starve" means "to perish from lack of food." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2228 (1981). It was appellants who caused Stephen to perish from a lack of food because they failed to provide him with adequate food and nourishment. The fact they also took affirmative action and restrained him during the course of starving him to death does not change the bottom line in this case. Stephen died from a lack of nourishment because appellants did not fulfill their legal duty to provide him with food, *i.e.,* they failed to act.

The evidence at trial also showed that appellants failed to provide Stephen with necessary medical care. According to medical experts, Stephen's body eventually reached such a severely malnourished condition that it began to "eat itself," causing Stephen's bodily functions to fail. Douglas told the jury that Stephen was very sick during the week before he was taken to the hospital, and that he could not even talk. He could only make grunting noises. Even though Stephen's poor health was apparent to his younger brother, no medical treatment was sought by appellants. Again, they failed to act in accordance with their legal duty as parents.

█ Having reviewed the evidence in the light most favorable to the verdict, we hold that it is legally sufficient to support appellants' convictions for injury to a child "by omission." Likewise, when measured by the jury charges, the evidence is sufficient to support appellants' convictions. Accordingly,

appellants' first and second points of error are overruled.

## DEADLY WEAPON FINDING

In their sixth point of error, appellants contend the trial court erred in permitting the State to seek a deadly weapon finding under article 42.12, section 3g(a)(2), of the Texas Code of Criminal Procedure. Appellants argue that because they were charged and convicted of the offense of injury to a child *by omission,* the State was precluded as a matter of law from seeking a deadly weapon finding alleging they used a deadly weapon during the "commission" of the offense. Appellants do not cite any authority to support their position. Rather, they again wage a battle of semantics.

█ Under the Code of Criminal Procedure, an affirmative finding on the use of a deadly weapon is appropriate when it is shown the defendant used or exhibited a deadly weapon "during the commission of a felony offense or during immediate flight therefrom...." TEX.CODE CRIM.PROC.ANN. art. 42.12, § 3g(a)(2) (Vernon Supp.1994). Appellants argue that in legal effect, the word "commission" is the opposite of the word "omission," and that therefore, when a defendant is found guilty of a felony offense by "omission," the State cannot allege during the punishment phase of trial that the defendant used a deadly weapon during the "commission" of the offense. We disagree.

In *Patterson v. State,* 769 S.W.2d 938 (Tex. Crim.App.1989), the Court of Criminal Appeals addressed the issue of what is sufficient to satisfy the requirement of "use" of a deadly weapon during the commission of a felony offense. The court agreed with the Austin Court of Appeals that *"all* felonies are theoretically susceptible to an affirmative finding of use or exhibition of a deadly weapon." *Id.* at 940. The court also agreed with the Austin Court of Appeals that use of a deadly weapon during the commission of a felony "extends ... to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Id.* at 941.

In the present case appellants' objective was to punish Stephen by withholding food. When Stephen went against appellants' punishment method and sought out food on his own, appellants took steps to restrain Stephen by chaining him to a cabinet with a chain, a metal rod, some belts and some locks. Thus, these potential deadly weapons were used by appellants to "facilitate" their goal of depriving Stephen of food, and the trial court did not err in permitting the State to seek an affirmative finding on the use of a deadly weapon. Appellants' sixth point of error is overruled.

In point of error number three, appellants contend their written judgments should be reformed to have the jury's affirmative finding on the deadly weapon issue deleted. This argument is based on the wording of the special issues submitted to the jury.

Under article 42.12, section 3g(a), of the Texas Code of Criminal procedure, a trial court is required to enter in the written judgment an affirmative finding on the use of a deadly weapon when it is shown that a defendant used or exhibited a deadly weapon "during the commission of a felony offense or during immediate flight therefrom...." TEX.CODE CRIM.PROC.ANN. art. 42.12, § 3g(a)(2) (Vernon Supp.1994). In the present case the trial court entered a notation in appellants' written judgments indicating an affirmative finding on the use of a deadly weapon. However, appellants argue that this is incorrect because, according to appellants, the record shows the requisite finding was not made by the jury in this case.

Each jury charge on punishment contained the following instruction and special issue on the use of a deadly weapon:

### SPECIAL ISSUE INSTRUCTIONS

"Deadly weapon" means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Now, if you find from the evidence beyond a reasonable doubt that the Defendant used a chain, rod, belts, or locks, either individually or in combination, and you further find that the chain, rod, belts, or locks, either individually or in combina-
tion was a deadly weapon as previously defined; or if you find that the Defendant was a party to the offense and knew that the chain, rod, belts, or locks, either individually or in combination, would be used, and you further find that the chain, rod, belts, or locks, either individually or in combination, was a deadly weapon, then you will answer the Special Issue "Yes". If you do not so believe, or if you have a reasonable doubt thereof, you will answer the Special Issue "No".

### SPECIAL ISSUE

Do you find beyond a reasonable doubt that the Defendant used a deadly weapon? Answer "Yes" or "No".

ANSWER: _____

The jury answered the special issue "yes" with respect to each appellant.

Because the special issues did not specifically ask the jury to determine whether a deadly weapon was used "during the commission of the offense," appellants contend the special issues, as worded, had no legal effect or consequence under article 42.12, section 3g(a), and were insufficient to require the trial court to enter an affirmative finding on the use of a deadly weapon in each appellant's written judgment. In support of this position, appellants rely on *Grettenberg v. State*, 790 S.W.2d 613 (Tex.Crim.App.1990); *Johnson v. State*, 777 S.W.2d 421 (Tex.Crim. App.1989); *Asberry v. State*, 813 S.W.2d 526 (Tex.App.—Dallas 1991, pet. ref'd); and *Riascos v. State*, 792 S.W.2d 754 (Tex.App.— Houston [14th Dist.] 1990, pet. ref'd). However, while the trial courts in each of those cases did submit a special issue which effectively inquired whether the defendant used or exhibited a deadly weapon "during the commission of the charged offense," those cases did not address the question of whether a special issue on the use of a deadly weapon is required to include this phrase, or what the legal effect is if this phrase is omitted from the special issue. Thus, we do not believe the above cases support appellants' position that the jury's answers to the special issues in the present case have no legal effect whatsoever.

■ Having reviewed article 42.12, section 3g(a), as well as the cases relied upon by appellants, we believe the trial court in the present case should have submitted special issues that effectively inquired as to whether each appellant used a deadly weapon "during the commission of the charged offense." However, we do not believe the failure to do so results in the jury's affirmative answers to the special issues submitted having no legal effect. Rather, we believe any error on the part of the trial court in failing to include this phrase is the same as any other charging error, which will be addressed in the next point of error. Appellants' third point of error, in which they allege their written judgments are in need of reformation because the jury's answers to the special issues on deadly weapon had no legal effect or consequence, is overruled.

In point of error number four appellants argue they suffered egregious harm as a result of the allegedly incorrect deadly weapon special issue submitted during the punishment stage of the trial. Appellants raise this point as an alternative to point of error three. Under point four, appellants recognize they did not object to the ommission of the phrase "during the commission of the charged offense" from the special issues submitted on use of a deadly weapon. However, appellants contend that even though there was no objection made at trial, this court must still determine under *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1984), whether appellants suffered egregious harm as a result of the error in the special issue.

■ Under the *Almanza* standard, for unobjected to error in the jury charge to be reversible, "the error must have been so harmful that the defendant was denied 'a fair and impartial trial.'" *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986). "In other words, a defendant must have suffered actual 'egregious' harm." *Id.* In making this determination, we must review the actual degree of harm in light of the entire jury charge. We must also consider the state of the evidence at trial, including the contested issues and the weight of the probative evidence, the argument of counsel and any oth-er relevant information revealed by the trial record as a whole. *Id.* at 351–52.

■ Applying the above standard to the present case, we do not believe appellants suffered egregious harm as a result of the omission of the phrase "during the commission of the charged offense" from the special issues submitted on use of a deadly weapon. There was no evidence at trial that appellants beat Stephen with any of the items alleged by the State to be deadly weapons. The only evidence presented at trial revealed that the only time appellants used these items was during the commission of this offense. Appellants used these items to facilitate their goal of restraining Stephen and preventing him from obtaining food on his own. The only reasonable reading of the jury's answer to the special issues, as submitted, is that appellants used the items during the commission of the offense. Thus, appellants did not suffer egregious harm as a result of the omission in the special issues and their fourth point of error is overruled.

In point of error number five, appellants complain about the parole law instructions given by the trial court pursuant to article 37.07, section 4, of the Texas Code of Criminal Procedure. Specifically, appellants contend the instructions given by the trial court improperly advised the jurors of the effect of their answer to the special issues on use of a deadly weapon.

Article 37.07, section 4, provides for two different parole law instructions. Under the provisions of article 37.07, section 4(a), if the defendant is found guilty of an offense listed in section 3g(a)(1), article 42.12, of the Code of Criminal Procedure, or if the judgment contains an affirmative finding on the use of a deadly weapon, the trial court is required to charge the jury in writing as follows:

"Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in mis-

conduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

"It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-fourth of the sentence imposed or 15 years, whichever is less, *without consideration of any good conduct time he may earn.* If the defendant is sentenced to a term of less than six years, he must serve at least two years before he is eligible for parole. *Eligibility for parole does not guarantee that parole will be granted.*[3]

"It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

"You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant."

TEX.CODE CRIM.PROC.ANN. art. 37.07, § 4(a) (Vernon Supp.1993) (emphasis added). On the other hand, if the offense the defendant is found guilty of is not listed in section 3g(a)(1), article 42.12, of the Code of Criminal Procedure, or, if the judgment does not contain an affirmative finding on use of a deadly weapon, the trial court is required to charge the jury in writing with the exact same

3. Article 37.07, section 4(a), was recently amended so that this paragraph now reads as follows:

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals *one-half* of the sentence imposed or *30 years*, whichever is less, without consideration of any good con-

charge as set out above, except that the third paragraph should read as follows:

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served *plus any good conduct time earned* equals one-fourth of the sentence imposed or 15 years, whichever is less. Eligibility for parole does not guarantee that parole will be granted."

*Id.* § 4(b) (emphasis added).

In the present case, the trial court gave the jury two alternative parole law instructions during the punishment stage of trial; one instruction concerning what the parole law would be if the jury found that appellants used a deadly weapon, and another instruction as to what the parole law would be if the jury found that appellants did not use a deadly weapon. Appellants objected at trial to giving both parole law instructions because, according to appellants, doing so improperly advised the jury of the effect of its answer to the deadly weapon issues. Appellants now raise this same complaint on appeal.

The wording of sections 4(a) and 4(b) of article 37.07 calls for the giving of *one* parole law instruction during the penalty phase of a trial. The determination of which instruction is given, that contained in section 4(a), or that contained in section 4(b), turns on whether the jury has previously answered the deadly weapon issue in the affirmative or in the negative. *See id.* §§ 4(a), 4(b). In other words, implicit in the wording of sections 4(a) and 4(b) is the requirement that the jury determine whether a deadly weapon was used, prior to the penalty phase of trial, so that the appropriate parole law instruction can be given during that phase.

duct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted." TEX.CODE CRIM.PROC.ANN. art. 37.07, § 4(a) (Vernon Supp.1994). However, appellants' cases are governed by the law in effect at the time they committed their offenses.

In the present case, while the parties were working on the court's charges for the guilt-innocence stage of trial, the State suggested that the special issues on use of a deadly weapon be included in the guilt-innocence charges, which would have solved the problem of having to submit the alternative parole law instructions. However, appellants raised some complaints about including the special issues during the guilt-innocence charge. Appellants objected to the submission of special issues on the use of a deadly weapon at any stage of the trial, but they particularly argued that if such special issues were to be submitted they should be submitted during the punishment stage of trial.

Appellants argued at trial, as they do on appeal, that the deadly weapon issue is clearly an issue to be decided during punishment and that it would be inappropriate to submit such an issue during the guilt-innocence stage of trial. However, this argument is inaccurate. *See Luken v. State,* 780 S.W.2d 264, 268 (Tex.Crim.App.1989) (acknowledging that Court of Criminal Appeals has never said deadly weapon issue must be resolved at punishment stage of trial); *McIntosh v. State,* 855 S.W.2d 753, 771 (Tex.App.—Dallas 1993, pet. ref'd) (holding that trial court is not prohibited from submitting special issue on use of a deadly weapon at the guilt-innocence stage of trial). In fact, the clear wording of sections 4(a) and 4(b) of article 37.07 implicitly requires the deadly weapon issue to be submitted at the guilt-innocence stage so that the trial court will know which parole law instruction to give the jury during the punishment stage of trial.[4]

In the present case, appellants specifically objected to the submission of the deadly weapon issues during the guilt-innocence phase of trial, and the trial court did not submit the deadly weapon issues at that time. As a result of appellants' objection, there was no finding on the use of a deadly weapon at the time of punishment and the trial court had no way of knowing which

parole law instruction to give the jury. Thus, any error on the part of the trial court in submitting the alternative parole law instructions during the punishment stage was invited and appellants cannot now complain of this error on appeal. *See Tucker v. State,* 771 S.W.2d 523, 534 (Tex.Crim.App.1988), *cert. denied,* 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *Henry v. State,* 732 S.W.2d 443, 444 (Tex.App.—Beaumont 1987, no pet.). Accordingly, appellants' fifth point of error is overruled.

The judgments of the trial court are affirmed.

---

4. The only other possibility would be to require the jury to retire to the jury room for deliberations on three separate occasions; the first time to determine guilt or innocence, the second time to determine whether the defendant used a deadly weapon, and a third time to determine the defendant's punishment. Appellants have not cited any authority, nor are we aware of any, supporting this method of submitting a defendant's case to the jury.