Opinion issued February 7, 2008















Opinion issued February 7, 2008

 

 

 

 

     

 



 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NOS.          01-06-00861-CR
& 01-06-00862-CR




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



TOMMY BALDWIN, Appellant

V.

STATE OF TEXAS,
Appellee

 

 



On Appeal from the 240th District Court

Fort Bend County, Texas

Trial Court Cause Nos. 37,244A & 37245A

 

 

MEMORANDUM OPINION

 

A jury found Tommy Baldwin guilty of
two charges of the first degree felony offense of injury to a child arising out
of the treatment of his two nephews. 
Following their conviction, the jury assessed punishment for Tommy at
ten and twenty years’ confinement for each charge, respectively.  See
Tex. Penal Code Ann. § 22.04 (Vernon Supp. 2007).  On appeal, Tommy challenges the legal and
factual sufficiency of the evidence supporting his convictions and the trial
court’s admission of testimony and a videotape concerning the victims’ forensic
interviews.  Finding no error, we
affirm.  

Background

          R.D.
and his younger brother, T.D., were born while their mother, Surrelia, was still
a teenager.  At first, they lived with
their maternal grandmother.  After a few
years, their grandmother died, and the boys then went to live with their
mother.  She had a drug problem, however,
and was unable to provide adequate care. 
When CPS intervened and investigated the boys’ care, Surrelia agreed to
let the boys live with her mother’s sister, Barbara Baldwin, and Barbara’s
husband, Tommy.  

          Surrelia
periodically had supervised visits with R.D. and T.D. at the CPS office.  During one visit, Surrelia noticed marks on
R.D.’s face.  R.D. told her that he got
the marks from sleeping on the garage floor where he had been sent to sleep as
punishment for doing something wrong. 
When Surrelia reported this incident to CPS, the boys were removed from
the Baldwin home and placed in foster
care.  But, after a few months, CPS
returned the boys to the Baldwins.  Soon after, Surrelia was convicted of theft
and possession of a controlled substance and went to prison.  During that time, she did not see her children.  

          According
to R.D., who was fourteen years old at time of trial, he and his brother slept
in the very back of the Baldwin house.  They would eat meals separately from the
family, by the front door in the hallway. 
Most of the time, the Baldwins fed him
sauerkraut, or rice and beans.  Both boys
qualified for free breakfast and lunch at school.  At some point, Barbara began bringing the
boys to school after breakfast time and taking the boys out of school at
lunchtime and bringing them back after lunch. 
Barbara gave him either a sandwich or, if he got in trouble at school,
sauerkraut as a “punishment food.”  R.D.
recalled having a lot of problems at school. 


R.D. testified that, while living
with the Baldwins, he did not get enough to
eat and was usually hungry.  He was so
hungry that he would take other people’s food at school.  After this happened, Barbara took the boys
out of public school and homeschooled them. 
If R.D. did not complete his homework, he would not be allowed to
eat.  When asked if he ever ate things
that people did not normally eat, R.D. testified that he had eaten dog food and
cat food found in the garage, and feces. 
T.D. also testified that he and his brother had eaten garbage and dog
food because they were not given enough to eat. 
R.D. recalled that when Tommy returned from work, he would see R.D. in
the locked garage on his way into the house but did nothing to help him, other
than to give him ice cream occasionally. 


T.D. testified that if he did not
complete his school work, Barbara would punish him by having him kneel and lift
his arms over his head until he was allowed to get up.  T.D. also recalled not getting enough to eat.

T.D. and R.D. did not get along.  The Baldwins
dealt with this by keeping the boys separated at night.  One would sleep in the locked bedroom and the
other would be locked in the garage to sleep there.  They would switch back and forth.  The Baldwins
would give the boy in the garage a bucket instead of allowing him to use the
bathroom inside.   

          When T.D. began attending public
elementary school, he was evaluated as emotionally disturbed and placed in
special education.  An elementary school
administrator recalled that both boys had behavioral problems.  When they got in trouble, it usually was for
stealing food.  The administrator also
testified that when she discussed the boys’ hunger with Barbara, Barbara
continued to insist on bringing the boys home for lunch, even though free
school lunch was available to them.  She
also began to bring the boys later to school, so that they would miss
breakfast, which was also free.  

          One
of R.D.’s elementary school teachers testified at trial.  She stated that she did not think that R.D.
had any behavior problems.  She recalled
that when Barbara came to the classroom, she would check R.D.’s desk and got
upset with him if he had already eaten part of his lunch.  After that, she began to take R.D. home for
lunch.  The teacher noticed that R.D.
still seemed hungry when he came back to school, and she would occasionally
share her lunch with him.  T.D. likewise
testified that the nurse and some of the teachers would share their food with
R.D. and him.  R.D.’s teacher also
remembered a few occasions when R.D. had stolen food from others in the
classroom.  She further recalled that he
was becoming noticeably thinner before Barbara withdrew him from school.  

          The elementary school nurse recalled
that the boys appeared to be hungry and always wanted to eat.  They would come to her office, and she would
talk with them and give them snacks.  The
nurse met with Barbara when she took the boys out of school, and gave her a
chart of the basic food groups.  Barbara
took the chart without comment.  The
nurse also testified that she would see the Baldwins
at church.  Sometime after Barbara
removed the boys from school, the nurse saw the boys at church and noticed that
R.D. appeared very thin, as if he were receiving chemotherapy or had
cancer.  

          In
late summer 2002, CPS received a referral concerning R.D. and T.D.  The referral stated that the boys were not
receiving proper nutrition and were being kept in the Baldwins’
garage.  When a CPS caseworker made
contact with the boys, the caseworker brought them to the CPS office and gave
them something to eat.  After R.D. ate,
his stomach began to hurt, and the caseworker brought him to Texas Children’s
Hospital emergency room.  

          Dr.
Kathleen Motil, a board-certified pediatrician and board-certified pediatric
gastroenterologist nutrition specialist at Texas Children’s, was called into
the emergency room to consult on R.D.’s case. 
Motil testified that R.D. was the most severely malnourished child she
had seen in a long time.  According to
Motil, R.D. was suffering from severe protein calorie malnutrition,
specifically of a combined kwashiorkor and marasmus type.  She added that numerous other diagnoses,
reflecting from the metabolic abnormalities of his body and resulting from the
severe malnutrition, could also apply. 
These additional conditions suffered by R.D. included anemia, hepatitis,
hypokalemia, and hypohosphatemia.  Motil
explained that these metabolic abnormalities were life-threatening
conditions.  For example, Motil
explained, potassium is extremely important in heart function, so that
abnormally low levels of potassium, such as those occurring in R.D., place
malnourished children at risk of death.   


As a result of the malnutrition, R.D.
also was so constipated from the malnutrition that he had an extremely
protuberant and hard abdomen.  Motil
diagnosed R.D. as having fecal impaction, which required treatment with an
invasive procedure.  Motil explained that
R.D.’s condition was consistent with his severe malnourishment.  

Also as a result of severe
malnourishment, R.D. lacked muscle and fat mass and had a damaged kidney.  To treat his malnourishment, R.D. was given
as much normal food as he wanted as well as vitamin and mineral
supplements.  Motil noted that R.D. had a
voracious appetite and that he hoarded food that he could not finish.  

R.D. was discharged from the hospital
after nine days, but was readmitted a little over a week later with an enlarged
liver.  Motil determined that R.D.’s
liver had swollen because he was eating so much at his foster care placement
that his starved body could not keep up. 
R.D.’s chest x-ray also showed an abnormal heart, which, Motil
explained, related to R.D.’s poor nutritional status, lack of good muscle tone,
and the beginning of correction of malnutrition by feeding.  Motil testified that, while refeeding
directly caused these abnormalities, starvation was their ultimate cause.   Motil explained that she was able to rule
out other possible causes because, by treating R.D. with a normal diet
supplemented with vitamins and minerals, he was able to recover from the
metabolic abnormalities, regain the weight he had lost, and catch up to a
height and weight consistent with what would have been expected based on
medical records of his growth from birth until he lived with the Baldwins.  

Based on her diagnosis and
observations, Motil ultimately concluded that, as a result of starvation, R.D.
suffered serious bodily injury that created a substantial risk of death.  Motil also opined that the permanent effects
of starvation cause R.D. to suffer an increased risk of death in the future
from hypertension, heart attack, or stroke. 


          Motil
concluded that T.D., too, suffered from chronic malnourishment.  During the time he lived at the Baldwins’ house, T.D. lost thirty-one percent of his body
mass.  The pediatrician observed that
T.D.’s larger size may have prevented him from suffering as severely from the
condition as his brother.  Nevertheless,
the pediatrician concluded, the large amount of body mass lost by T.D. placed
him in serious risk and his condition ultimately could have lead to his
death.  Once T.D. left the Baldwins’ home and was placed in foster care, he grew
over an inch in just a few weeks.  A
social worker who had observed T.D. testified that T.D. also showed signs of
hoarding food and became very upset and agitated when he did not have free access
to food.   

Discussion

I.       Legal and Factual Sufficiency Challenge

Tommy first contends that the
evidence is legally and factually insufficient to support his convictions on
each of the two counts.  Specifically, he
asserts that the evidence is legally and factually insufficient to support,
beyond a reasonable doubt, a finding that he intentionally or knowingly caused
serious bodily injury to the victims by failing to provide adequate food or
nourishment or adequate medical care.  

          Standard of review

In evaluating the legal sufficiency
of the evidence, we view it in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005).
The standard is the same for both direct and circumstantial evidence
cases.  King v. State, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995).  

We
do not weigh any evidence or evaluate the credibility of any witnesses, as this
was the function of the fact finder. See Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); Adelman v. State, 828 S.W.2d 418, 421
(Tex. Crim. App. 1992).  Instead, we must
determine whether both the explicit and implicit findings of the trier of fact
are rational by viewing all the evidence admitted at trial in the light most
favorable to the verdict. See Adelman,
828 S.W.2d at 422.  In making this
determination, we resolve any inconsistencies in the evidence in favor of the
verdict.  Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991).  

In conducting a factual sufficiency
review, we view all of the evidence in a neutral light.  Ladd v.
State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).  Our factual sufficiency review must include a
discussion of the most important and relevant evidence that supports the
appellant’s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App.
2003).  We will set aside the verdict
only if (1) the evidence is so weak that the verdict is clearly wrong and
manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  We may not conclude that the
evidence is factually insufficient simply because we disagree with the
verdict.  Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).  The fact finder alone determines the
credibility of the witnesses and may choose to believe all, some, or none of
their testimony.  Cain v. State, 958 S.W.2d 404, 407 n.5 (Tex. Crim. App. 1997).   

Felony injury to a child

          The
jury charge instructed the jury to convict Tommy if it determined from the
evidence beyond a reasonable doubt that he intentionally or knowingly by act or
omission caused serious bodily injury or serious
mental deficiency or impairment to T.D. 
Tommy asserts no challenge to the legal or factual sufficiency of the
evidence to show that he caused serious mental deficiency or impairment to
T.D.  Having failed to challenge that he
caused serious mental deficiency or impairment to T.D., we hold the evidence is
legally and factually sufficient to uphold the conviction for felony injury to
a child.  We further determine that the
evidence is legally and factually sufficient to show that Tommy caused serious
bodily injury to R.D. and T.D.  

Injury to a child is a
result-oriented offense requiring a mental state that relates not to the
charged conduct but to the result of the conduct.  See Alvarado v. State, 704 S.W.2d 36, 38 (Tex. Crim. App. 1985);
see also Stuhler v. State,
218 S.W.3d 706, 718 (Tex. Crim. App. 2007). 
It is not enough for the State to prove that the defendant engaged in
the alleged conduct with the requisite criminal intent; the State must also
prove that the defendant caused the result with the requisite criminal intent.  Lee v.
State, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref’d) (citing Cook v. State, 884 S.W.2d 485, 490 (Tex.
Crim. App. 1994)).  

The fact finder may infer intent from
the accused’s acts and words as well as the surrounding circumstances.  See Ledesma
v. State, 677 S.W.2d 529, 531 (Tex.
Crim. App. 1984).  A jury may reasonably
infer that the defendant intentionally, not accidentally, inflicted the injury
when the defendant fails to render aid known to be needed.  Tezino
v. State, 765 S.W.2d 482, 485 (Tex.
App.—Houston [1st Dist.] 1988, pet. ref’d). 
A reasonable inference also arises in the presence of proof that the defendant tried to conceal the
conditions that led to the victim’s injuries. 
Id. at 485.  

          The
jury heard evidence that both R.D. and T.D. lost weight and stopped growing
during the three years they lived with the Baldwins,
and had an opportunity to view photographs of the boys.  The jury also heard testimony from Barbara
that the boys suffered from persistent diarrhea for a three-year period.  Barbara testified that she sent the boys to
school wearing disposable diapers when they had diarrhea.  Even while attributing the diarrhea to the
fact that they ate dog food, she acknowledged the diarrhea was a problem.  Yet, she admitted that T.D. had diarrhea for
a year before she took him for a doctor visit, and her testimony was at odds
with the  doctor’s recommendation,
reflected in the medical records, that T.D. receive a high-fat, high-calorie
diet.  She also conceded that she took
T.D. to the doctor only once during the three years the boys lived with her,
and that she did not take R.D. to see a doctor for treatment at all.

            Barbara also testified that the boys had good
appetites, yet she prevented the boys from participating in the free breakfast
and lunch programs at public school and eventually removed them from public
school altogether as they became noticeably thinner and constantly sought
food.  She also punished the boys for
eating at school when they were hungry and admitted to using “punishment food,”
such as sauerkraut, to discipline the children, even though she denied
depriving them of adequate food.

          The
jury could also reasonably infer that Tommy observed the boys’ conditions and
their constant hunger.  Tommy testified
that he also gave the boys punishment food whenever they did something
wrong.  He also stated that he was aware
that the boys had persistent diarrhea and that they were losing weight, yet he
conceded that he did not take them to the doctor.  The jury also heard that Tommy would see the
boys in the locked garage when he returned home from work and did nothing to
help them.  One of the boys testified
that Tommy would bring them out for fast food approximately once a week and occasionally
gave them ice cream.  Tommy also admitted
that he could not explain how the boys lost weight and failed to grow
taller.  This testimony supports a
reasonable inference that Tommy observed the boys’ appearance and was aware
that they were not getting enough food, yet did nothing to change the
situation.  The attempts to conceal
treatment of the boys, coupled with the testimony of the hospital pediatrician
concerning the severity of their malnourishment, permitted the jury to
reasonably infer that R.D. and T.D. suffered serious bodily injury because Tommy
intentionally and knowingly failed to provide them with adequate nutrition and medical
care.  See, e.g., Hill v. State, 881
S.W.2d 897, 900–01 (Tex. App.—Fort Worth 1994) (holding that evidence supported
conviction for injury to child by food deprivation where evidence suggested
that deprivation occurred over course of several years, victim’s growth chart
had flat-lined, parents ate normal food separately from children and punished
victim for attempting to take food from kitchen when hungry, and victim was
restrained to prevent him from obtaining food without permission and
essentially died of starvation), aff’d,
913 S.W.2d 581 (Tex. Crim. App. 1996).  The
jury need not have credited the Baldwins’
testimony attributing the boys’ malnutrition to emotional and behavioral
problems.  See Dewberry, 4 S.W.3d at
740.  We disagree with Tommy that the
three-year period of nutritional deprivation evidenced at trial is not legally
and factually sufficient to support his convictions.  His failure to obtain
medical attention or provide adequate food or nourishment in light of the boys’
obviously malnourished condition and persistent diarrhea supports a reasonable
inference that he consciously desired or was aware that his conduct was
reasonably certain to cause the boys serious bodily injury, and such findings
are not against the great weight and preponderance of the evidence.    

II.      Evidentiary
challenge

 

          Tommy
next contends that the trial court erred in allowing Bonnie Martin, a forensic
interviewer with Fort Bend County Children’s Advocacy Center,
testify about the outcry statements made to her by R.D. and T.D. and allowing
into evidence videotapes of those statements. 
We review a trial court’s decision to admit or exclude evidence for an
abuse of discretion.  Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App.
2003).  A
reviewing court should not reverse unless the record shows a clear abuse of discretion. Zuliani, 97
S.W.3d at 595; Roberts v. State, 29
S.W.3d 596, 600 (Tex. App.—Houston
[1st Dist.] 2000, pet. ref’d).  An abuse of discretion exists only when the trial judge’s decision was so
clearly wrong as to lie outside that zone within which reasonable persons might
disagree.  Zuliani, 97 S.W.3d at 595; Roberts,
29 S.W.3d at 600.  

          

Our review of the record
reveals that Martin did not testify as an outcry witness.  Although the State initially designated
Martin as an outcry witness, she testified before the jury only to authenticate
the videotapes of the interviews she conducted with R.D. and T.D.  Defense counsel specifically informed the
trial court that the defense had “no problem” with allowing the State to bring
Martin as a witness for that purpose. 
Accordingly, we find no merit to Tommy’s challenge to the admission of
Martin’s testimony.  

Conclusion

 

          We
conclude that the evidence is legally and factually sufficient to support the
jury’s findings of guilt on both counts of felony injury to a child against
Tommy Baldwin, and that the trial court did not abuse its discretion in
admitting Martin’s testimony.  Finding no
error, we affirm the judgments of the trial court.

 

Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Alcala and Bland.

Do not publish.  See
Tex. R. App. P. 47.2(b).