Opinion issued February 7, 2008









 

 

 

 

Opinion issued February 7,
2008

    


 



 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NOS.          01-06-00859-CR & 01-06-00860-CR 

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



BARBARA DEAN BALDWIN, Appellant

V.

STATE OF TEXAS, Appellee

 



On
Appeal from the 240th District Court

Fort Bend County, Texas

Trial Court Cause Nos. 37,242A & 37,243A

 

 

O P I N I O N

 

A jury found Barbara Dean Baldwin
guilty of two charges of the first degree felony offense of injury to a child. 
Following her convictions, the jury assessed punishment at thirty and forty
years’ confinement for each charge, respectively.  See Tex. Penal Code Ann. § 22.04 (Vernon Supp. 2007).  On appeal, Barbara
challenges the legal and factual sufficiency of the evidence supporting her
convictions and the trial court’s admission of testimony and a videotape
concerning the victims’ forensic interviews.  Finding no error, we affirm.  

Background

                R.D. and his younger brother, T.D.,
were born while their mother, Surrelia, was still a teenager.  At first, they
lived with their maternal grandmother.  After a few years, their grandmother
died, and the boys then went to live with their mother.  She had a drug
problem, however, and was unable to provide adequate care.  When CPS intervened
and investigated the boys’ care, Surrelia agreed to let the boys live with her
mother’s sister, Barbara, and Barbara’s husband, Tommy Baldwin.  

          Surrelia periodically had
supervised visits with R.D. and T.D. at the CPS office.  During one visit,
Surrelia noticed marks on R.D.’s face.  R.D. told her that he got the marks
from sleeping on the garage floor where he had been sent to sleep as punishment
for doing something wrong.  When Surrelia reported this incident to CPS, the
boys were removed from the Baldwin home and placed in foster care.  But, after
a few months, CPS returned the boys to the Baldwins.  Soon after, Surrelia was
convicted of theft and possession of a controlled substance and went to
prison.  During that time, she did not see her children.  

          According to R.D., who was
fourteen years old at time of trial, he and his brother slept in the very back
room of the Baldwin house.  They would eat meals separately from the family, by
the front door in the hallway.  Most of the time, the Baldwins fed him
sauerkraut, or rice and beans.  Both boys qualified for free breakfast and
lunch at school.  At some point, Barbara began bringing the boys to school
after breakfast time and taking the boys out of school at lunchtime and
bringing them back after lunch.  Barbara gave him either a sandwich or, if he
got in trouble at school, sauerkraut as a “punishment food.”  R.D. recalled
having a lot of problems at school.  

R.D. testified that, while living
with the Baldwins, he did not get enough to eat and was usually hungry.  He was
so hungry that he would take other people’s food at school.  After this
happened, Barbara took the boys out of public school and homeschooled them.  If
R.D. did not complete his homework, he would not be allowed to eat.  When asked
if he ever ate things that people did not normally eat, R.D. testified that he
had eaten dog food and cat food found in the garage, and feces.  T.D. also
testified that he and his brother had eaten garbage and dog food because they
were not given enough to eat.  R.D. recalled that when Tommy returned from
work, he would see R.D. in the locked garage on his way into the house but did
nothing to help him, other than to give him ice cream occasionally.  

T.D. testified that if he did not
complete his school work, Barbara would punish him by having him kneel and lift
his arms over his head until he was allowed to get up.  T.D. also recalled not
getting enough to eat.

T.D. and R.D. did not get along.  The
 Baldwins dealt with this by keeping the boys separated at night.  One would
sleep in the locked bedroom and the other would be locked in the garage to
sleep there.  They would switch back and forth.  The Baldwins would give the
boy in the garage a bucket instead of allowing him to use the bathroom
inside.   

          When T.D. began attending
public elementary school, he was evaluated as emotionally disturbed and placed
in special education.  An elementary school administrator recalled that both
boys had behavioral problems.  When they got in trouble, it usually was for
stealing food.  The administrator also testified that when she discussed the
boys’ hunger with Barbara, Barbara continued to insist on bringing the boys
home for lunch, even though free school lunch was available to them.  She also
began to bring the boys later to school, so that they would miss breakfast,
which was also free.  

          One of R.D.’s elementary
school teachers testified at trial.  She stated that she did not think that
R.D. had any behavior problems.  She recalled that when Barbara came to the
classroom, she would check R.D.’s desk and got upset with him if he had already
eaten part of his lunch.  After that, she began to take R.D. home for lunch. 
The teacher noticed that R.D. still seemed hungry when he came back to school,
and she would occasionally share her lunch with him.  T.D. likewise testified
that the nurse and some of the teachers would share their food with R.D. and
him.  R.D.’s teacher also remembered a few occasions when R.D. had stolen food
from others in the classroom.  She further recalled that he was becoming
noticeably thinner before Barbara withdrew him from school.  

          The elementary school nurse
recalled that the boys appeared to be hungry and always wanted to eat.  They
would come to her office, and she would talk with them and give them snacks. 
The nurse met with Barbara when she took the boys out of school, and gave her a
chart of the basic food groups.  Barbara took the chart without comment.  The
nurse also testified that she would see the Baldwins at church.  Sometime after
Barbara removed the boys from school, the nurse saw the boys at church and
noticed that R.D. appeared very thin, as if he were receiving chemotherapy or
had cancer.  

          In late summer 2002, CPS
received a referral concerning R.D. and T.D.  The referral stated that the boys
were not receiving proper nutrition and were being kept in the Baldwins’ garage.  When a CPS caseworker made contact with the boys, the caseworker brought
them to the CPS office and gave them something to eat.  After R.D. ate, his
stomach began to hurt, and the caseworker brought him to Texas Children’s
Hospital emergency room.  

          Dr. Kathleen Motil, a
board-certified pediatrician and board-certified pediatric gastroenterologist
nutrition specialist at Texas Children’s, was called into the emergency room to
consult on R.D.’s case.  Motil testified that R.D. was the most severely
malnourished child she had seen in a long time.  According to Motil, R.D. was
suffering from severe protein calorie malnutrition, specifically of a combined
kwashiorkor and marasmus type.  She added that numerous other diagnoses,
reflecting from the metabolic abnormalities of his body and resulting from the
severe malnutrition, could also apply.  These additional conditions suffered by
R.D. included anemia, hepatitis, hypokalemia, and hypohosphatemia.  Motil explained
that these metabolic abnormalities were life-threatening conditions.  For
example, Motil explained, potassium is extremely important in heart function,
so that abnormally low levels of potassium, such as those occurring in R.D.,
place malnourished children at risk of death.    

As a result of the malnutrition, R.D.
also was so constipated from the malnutrition that he had an extremely
protuberant and hard abdomen.  Motil diagnosed R.D. as having fecal impaction,
which required treatment with an invasive procedure.  Motil explained that
R.D.’s condition was consistent with his severely malnourished condition.  

Also as a result of severe
malnourishment, R.D. lacked muscle and fat mass and had a damaged kidney.  To
treat his malnutrition, R.D. was given as much normal food as he wanted as well
as vitamin and mineral supplements.  Motil noted that R.D. had a voracious
appetite and that he hoarded food that he could not finish.  

R.D. was discharged from the hospital
after nine days, but was readmitted a little over a week later with an enlarged
liver.  Motil determined that R.D.’s liver had swollen because he was eating so
much at his foster care placement that his starved body could not keep up. 
R.D.’s chest x-ray also showed an abnormal heart, which, Motil explained,
related to R.D.’s poor nutritional status, lack of good muscle tone, and the
beginning of correction of malnutrition by feeding.  Motil testified that,
while refeeding directly caused these abnormalities, starvation was their
ultimate cause.   Motil explained that she was able to rule out other possible
causes because, by treating R.D. with a normal diet supplemented with vitamins
and minerals, he was able to recover from the metabolic abnormalities, regain
the weight he had lost, and catch up to a height and weight consistent with
what would have been expected based on medical records of his growth from birth
until he lived with the Baldwins.  

Based on her diagnosis and
observations, Motil ultimately concluded that, as a result of starvation, R.D.
suffered serious bodily injury that created a substantial risk of death.  Motil
also opined that the permanent effects of starvation cause R.D. to suffer an
increased risk of death in the future from hypertension, heart attack, or
stroke.  

          Motil concluded that T.D.,
too, suffered from chronic malnutrition.  During the time he lived at the Baldwins’ house, T.D. lost thirty-one percent of his body mass.  The pediatrician observed
that T.D.’s larger size may have prevented him from suffering as severely from
the condition as his brother.  Nevertheless, the pediatrician concluded, the
large amount of body mass lost by T.D. placed him in serious risk and his
condition ultimately could have lead to his death.  Once T.D. left the Baldwins’ home and was placed in foster care, he grew over an inch in just a few weeks.  A
social worker who had observed T.D. testified that T.D. also showed signs of
hoarding food and became very upset and agitated when he did not have free
access to food.  

Discussion

I.       Legal and Factual Sufficiency Challenge

Barbara first contends that the
evidence is legally and factually insufficient to support her convictions on
each of the two counts.  Specifically, she asserts that the evidence is legally
and factually insufficient to support, beyond a reasonable doubt, a finding
that she intentionally or knowingly caused serious bodily injury to the
victims.  Barbara contends that Dr. Motil’s testimony shows that T.D. would
only have suffered a substantial risk of death if he remained in the
environment he was in, not that T.D. suffered serious bodily injury.   

          Standard of review

In evaluating the legal sufficiency
of the evidence, we view it in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175
S.W.3d 795, 798 (Tex. Crim. App. 2005).  The standard is the same for both
direct and circumstantial evidence cases.  King v. State, 895 S.W.2d
701, 703 (Tex. Crim. App. 1995).  

We do not weigh any evidence or
evaluate the credibility of any witnesses, as this was the function of the
trier of fact. See Dewberry v. State, 4 S.W.3d 735, 740 (Tex.
Crim. App. 1999); Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App.
1992).  Instead, we must determine whether both the explicit and implicit
findings of the trier of fact are rational by viewing all the evidence admitted
at trial in the light most favorable to the verdict. See Adelman,
828 S.W.2d at 422.  In making this determination, we resolve any
inconsistencies in the evidence in favor of the verdict.  Matson v. State,
819 S.W.2d 839, 843 (Tex. Crim. App. 1991).  

In conducting a factual sufficiency
review, we view all of the evidence in a neutral light.  Ladd v. State,
3 S.W.3d 547, 557 (Tex. Crim. App. 1999).  Our factual sufficiency review must
include a discussion of the most important and relevant evidence that supports
the appellant’s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).  We will set aside the verdict only if (1) the evidence
is so weak that the verdict is clearly wrong and manifestly unjust or (2) the
verdict is against the great weight and preponderance of the evidence.  Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  We may not conclude that
the evidence is factually insufficient simply because we disagree with the
verdict.  Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). 
The fact finder alone determines the credibility of the witnesses and may
choose to believe all, some, or none of the testimony presented.  Cain v.
State, 958 S.W.2d 404, 407 n.5 (Tex. Crim. App. 1997).   

Felony injury to a child

          The jury charge instructed
the jury to convict Barbara if it determined from the evidence beyond a
reasonable doubt that she intentionally or knowingly by act or omission caused
serious bodily injury or serious mental deficiency or impairment to
T.D.  Barbara asserts no challenge to the legal or factual sufficiency of the
evidence to show that she caused serious mental deficiency or impairment to
T.D.  Having failed to challenge that she caused serious mental deficiency of
impairment to T.D., we hold the evidence is legally and factually sufficient to
uphold the conviction for felony injury to a child.  We further determine that
the evidence is legally and factually sufficient to show that Barbara caused
serious bodily injury to R.D. and T.D.  

Injury to a child is a result-oriented
offense requiring a mental state that relates not to the charged conduct but to
the result of the conduct.  See Alvarado v. State, 704 S.W.2d 36, 38
(Tex. Crim. App. 1985);
see also Stuhler v. State, 218 S.W.3d 706, 718 (Tex. Crim.
App. 2007).  It is not enough for the State to prove that the defendant engaged
in the alleged conduct with the requisite criminal intent; the State must also
prove that the defendant caused the result with the requisite criminal intent. 
Lee v. State, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref’d)
(citing Cook v. State, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994).  

The fact finder may infer intent from
the accused’s acts and words as well as the surrounding circumstances.  See
Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).  A jury may
reasonably infer that the defendant intentionally, not accidentally, inflicted
the injury when the defendant fails to render aid known to be needed.  Tezino
v. State, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet.
ref’d).  A reasonable inference also arises in the presence of proof that the defendant tried to conceal the
conditions that led to the victim’s injuries.  Id. at 485.  

          The jury heard evidence
that both R.D. and T.D. lost weight and stopped growing during the three years
they lived with the Baldwins, and had an opportunity to view photographs of the
boys.  The jury also heard testimony from Barbara that the boys suffered from
persistent diarrhea for a three-year period.  Barbara testified that she sent
the boys to school wearing disposable diapers when they had diarrhea.  Even
while attributing the diarrhea to the fact that they ate dog food, she
acknowledged the diarrhea was a problem.  Yet, she admitted that T.D. had
diarrhea for a year before she took him for a doctor visit, and her testimony
was at odds with the  doctor’s recommendation, reflected in the medical
records, that T.D. receive a high-fat, high-calorie diet.  She also conceded
that she took T.D. to the doctor only once during the three years the boys
lived with her, and that she did not take R.D. to see a doctor for treatment at
all.

            Barbara also testified
that the boys had good appetites, yet she prevented the boys from participating
in the free breakfast and lunch programs at public school and eventually
removed them from public school altogether as they became noticeably thinner and
constantly sought food.  She also punished the boys for eating at school when
they were hungry and admitted to using “punishment food,” such as sauerkraut,
to discipline the children, even though she denied depriving them of adequate
food.  The attempts to conceal treatment of the boys, coupled with the
testimony of the hospital pediatrician concerning the severity of their
malnourishment, permitted the jury to reasonably infer that R.D. and T.D.
suffered serious bodily injury because Barbara intentionally and knowingly
failed to provide them with adequate nutrition and medical care.  See, e.g.,
Hill v. State,
881 S.W.2d 897, 900–01 (Tex. App.—Fort Worth 1994) (holding that evidence was
sufficient to support conviction for injury to child by food deprivation where
evidence suggested that deprivation occurred over course of several years,
victim’s growth chart had flat-lined, parents ate normal food separately from
children and punished victim for attempting to take food from kitchen when
hungry, and victim was restrained to prevent him from obtaining food without
permission and essentially died of starvation), aff’d, 913 S.W.2d 581
(Tex. Crim. App. 1996).  The jury need not have credited Barbara’s
testimony attributing the boys’ malnutrition to emotional and behavioral
problems.  See Dewberry, 4 S.W.3d at 740.  We disagree with Barbara that
the three-year period of nutritional deprivation evidenced at trial is not
legally and factually sufficient to support her convictions.  Her failure to obtain medical attention or provide adequate food or
nourishment in light of the boys’ obviously malnourished condition and
persistent diarrhea supports a reasonable inference that she consciously
desired or was aware that her conduct was reasonably certain to cause the boys
serious bodily injury, and such findings are not against the great weight and
preponderance of the evidence. 

II.      Evidentiary
challenge

 

          Barbara next contends that
the trial court erred in allowing Bonnie Martin, a forensic interviewer with
Fort Bend County Children’s Advocacy Center, testify about the outcry
statements made to her by R.D. and T.D. and allowing into evidence videotapes
of those statements.  We review a trial court’s decision to admit or exclude
evidence for an abuse of discretion.  Zuliani v. State, 97 S.W.3d 589,
595 (Tex. Crim. App. 2003).  A reviewing court should
not reverse unless the record shows a clear abuse of discretion. Id.; Roberts v. State, 29 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.]
2000, pet. ref’d).  An abuse of discretion exists only when the trial judge’s
decision was so clearly wrong as to lie outside that zone within which
reasonable persons might disagree.  Zuliani, 97 S.W.3d at 595; Roberts,
29 S.W.3d at 600.  

          Our review of
the record reveals that Martin did not testify as an outcry witness.  Although
the State initially designated Martin as an outcry witness, she testified
before the jury only to authenticate the videotapes of the interviews she
conducted with R.D. and T.D.  Defense counsel specifically informed the trial
court that the defense had “no problem” with allowing the State to bring Martin
as a witness for that purpose.  Accordingly, we find no merit to Barbara’s
challenge to the admission of Martin’s testimony.  

Conclusion

 

          We conclude that the evidence
is legally and factually sufficient to support the jury’s findings of guilt on
both counts of felony injury to a child against Barbara Dean Baldwin, and that
the trial court did not abuse its discretion in admitting Martin’s testimony. 
Finding no error, we affirm the judgments of the trial court.

 

Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Alcala and Bland.

Publish.  See Tex. R. App. P. 47.2(b).